## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CLARENCE FRY.                          )
                                       )          **CAPITAL HABEAS CASE**
    **Appellant/Petitioner,**        )
                                       )          **CASE NO. 23-3270**
**v.**                                 )
                                       )
**TIM SHOOP, Warden,**                 )
                                       )
    **Appellee/Respondent.**         )

---

## APPELLANT CLARENCE FRY'S MERIT BRIEF

---

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar No. 0051928

/s/ Sharon A. Hicks
SHARON A. HICKS
Ohio Bar No. 0076178
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Ohio
Capital Habeas Unit
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951 (f)
Sharon_Hicks@fd.org

**COUNSEL FOR APPELLANT
CLARENCE FRY**

/s/ Kimberly S. Rigby
KIMBERLY S. RIGBY
Ohio Bar No. 0078245
Managing Counsel, Death Penalty Dept.
Office of the Ohio Public Defender
Kimberly.Rigby@opd.ohio.gov

/s/ Adam D. Vincent
ADAM D. VINCENT
Ohio Bar No. 0098778
Assistant Public Defender
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, OH 43215
(614) 466-5394; (614) 644-0708 (f)
Adam.Vincent@opd.ohio.gov

# <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... v

Statement In Support of Oral Argument ................................................................... 1

    Procedural History and Statement of Facts ....................................................... 2

    A.    Introduction. ........................................................................................... 2

    B.    Relevant Procedural History ................................................................. 2

    C.    Statement of Facts ................................................................................. 5

            1.    Domestic dispute between Fry and Hardison ............................ 5

            2.    Fry's confrontation of Hardison to retrieve his stolen property ........................................................................... 7

            3.    Deteriorated relationship between Fry and trial counsel ........... 8

            4.    Plea discussion with Fry and the continued deterioration of the attorney-client relationship ...................................... 9

Argument ........................................................................................................................ 16

**CLAIM FOR RELIEF 1(A)**: FRY WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS COUNSEL FAILED TO EFFECTIVELY COUNSEL AND RELAY THE STATE'S PLEA OFFER ....................................................................................... 16

    A.    Rulings Below ......................................................................................... 16

    B.    Clearly Established Federal Law............................................................ 18

    C.    Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance to counsel............................................................. 23

1.      Trial counsel were ineffective in relaying the offered plea deal ...................................................................................24

2.      Fry's counsel's ineffective performance prejudiced Fry ..........25

    a.      The state court's decision was based on an unreasonable determination of fact .......................................................25

    b.      The state court's decision was based on an unreasonable application of federal law ...............................................27

D.     Conclusion....................................................................................29

**CLAIM FOR RELIEF 1(B)**: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY PREVENTED FRY FROM EXERCISING HIS CONSTITUTIONAL RIGHT TO TESTIFY IN HIS OWN DEFENSE ...................................................30

A.     Rulings Below ..............................................................................31

B.     Clearly Established Federal Law.........................................................32

C.     Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance of counsel ...........................................................33

D.     District Court Erred in Denying Fry Habeas Relief............................41

**CLAIM FOR RELIEF 2**: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY ALLOWED FRY TO WAIVE HIS RIGHT TO PRESENT MITIGATION EVIDENCE. BECAUSE TRIAL COUNSEL DID NOT INFORM FRY OF THE CONSEQUENCES OF WAIVER, THE WAIVER WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT. ...................................................42

A.     Rulings Below ..............................................................................43

B.     Clearly Established Federal Law.........................................................45

C.      Merits: Fry has demonstrated that he was deprived of his constitutional right to the effective assistance of counsel ............................................46

D.      District Court Erred in Denying Fry Habeas Relief.............................52

        1.      District Court Adjudication of Supreme Court of Ohio Decision ....................................................................53

        2.      District Court Adjudication of Ninth District Court of Appeals Decision ....................................................................54

                a.      *Cronic* Claim. .................................................................55

                b.      *Strickland* Claim. .........................................................57

E.      Conclusion.........................................................................58

**CLAIM FOR RELIEF 10**: THE TRIAL COURT VIOLATED FRY'S RIGHT TO TESTIFY IN HIS OWN DEFENSE WHEN THE COURT FAILED TO CONDUCT AN INDEPENDENT INQUIRY OF FRY ...............................................................59

A.      Rulings Below .....................................................................59

B.      Clearly Established Federal Law........................................................60

C.      Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance of counsel ...........................................................61

        1.      The Ohio Court of Appeals' Decision Was Unreasonable ........62

        2.      District Court Erred in Denying Fry Habeas Relief...................65

D.      Conclusion.........................................................................66

**CLAIM FOR RELIEF 11:** THE TRIAL COURT AND THE STATE OF OHIO VIOLATED FRY'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE COURT ERRONEOUSLY ALLOWED FRY TO WAIVE THE PRESENTATION OF MITIGATION EVIDENCE. ...........................................67

A.      Ruling Below.......................................................................67

B.      Clearly Established Federal Law........................................................69

D.    Merits..............................................................................70

E.    Conclusion......................................................................72

**CLAIM FOR RELIEF 19:** FRY'S APPELLATE COUNSEL WERE INEFFECTIVE BY FAILING TO RAISE ON DIRECT APPEAL TO THE OHIO SUPREME COURT THAT FRY'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PLEA BARGAINING PROCESS, DEPRIVING FRY OF HIS DUE PROCESS RIGHTS UNDER U. S. CONST. AMENDS. 6 & 14. ..................................................................73

A.    Rulings Below ................................................................73

B.    Procedural Default.........................................................74

C.    Clearly Established Federal Law.....................................81

D.    Merits..............................................................................81

E.    Conclusion......................................................................82

II.    Conclusion ............................................................................83

Certificate of Compliance .........................................................84

Certificate of Service ................................................................84

Petitioner-Appellant's Designation of Relevant District Court Documents ..........85

## TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393................................................69

*Boria v. Keane*, 99 F.3d 492 (2d Cir. 1996) ......................................................19

*But cf. Johnson v. Williams*, 568 U.S. 289 (2013)............................................54

*Davis v. United States*, ___U.S.___, 143 S.Ct. 647 (2023)...................................19

*Dedvukovic v. Martin*, 36 F.App'x 795 (6th Cir. 2002) ................................. 19, 21

*Duncan v. Henry*, 513 U.S. 364 (1995) ..............................................................52

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)......................................................70

*Esslinger v. Davis*, 44 F.3d 1515 (5th Cir. 1998)..............................................76

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................................81

*Faretta v. California*, 422 U.S. 806 (1975) ............................................... 31, 39, 60

*Ford v. Georgia,* 498 U.S. 411, 413 (1991)........................................................77

*Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006) ..........................................78

*Gardner v. Florida*, 430 U.S. 349 (1977)..........................................................72

*Gideon v. Wainwright*, 372 U.S. 335 (1963) .....................................................44

*Griffin v. United States*, 330 F.3d 733 (6th Cir 2003) ...................................... 21, 27

*Hardiman v. Reynolds*, 871 F.2d 500 (10th Cir. 1992) .......................................76

*Harrington v. Richter*, 562 U.S. 86 (2011)..................................................... 73, 79

*Harris v. New York*, 401 U.S. 222 (1971)...........................................................61

*Hodges v. Easton*, 106 U.S. 408, 412)...............................................................69

*Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005)...........................................76

*Illinois v. Rodriguez*, 497 U.S. 177 (1990) ........................................................69

*In re Oliver*, 333 U.S. 257 (1948)......................................................................60

*Jamison v. Collins*, 100 F.Supp.2d 521 (S.D. Ohio 1998) ..................................74

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ....................................................... *passim*

*Kares v. Morrison*, 77 F.4th 411 (6th Cir. 2023)....................................................79

*Lafler* v. *Cooper*, 566 U. S. 156 (2012).......................................................... *passim*

*Lockett v. Ohio* 438 U.S. 586 (1978) .......................................................... 64, 67, 70

*Logan v. United States*, 910 F.3d 864 (6th Cir.2018).............................................18

*Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002) ....................................................76

*Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).................................................. 78, 81

*Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) ......................................................77

*McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000).................................................53

*Missouri v. Frye*, 132 S. Ct. 1399 (2012) ..............................................................81

*Missouri v. Frye*, 566 U.S. 134 (2012) ........................................................ 18, 19, 21

*Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) ............................64

*Padilla v. Kentucky*, 130 S. Ct. 1473 (2010) .........................................................81

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................................18

*Payne v. Tennessee*, 510 U.S. 808 (1991) ..............................................................70

*Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997) ............................................... 44, 56

*Rock v. Arkansas,* 483 U.S. 44 (1987) ......................................................... 31, 39, 61

*Rogers v. Howes*, 144 F.3d (6th Cir. 1998) ...........................................................77

*Rompilla v. Beard*, 545 U.S. 374 (2005) ...............................................................18

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).................................................69

*Smith v. United States*, 348 F.3d 545 (6th Cir.2003)..............................................21

*State v. Ashworth*, 706 N.E.2d 1231 (Ohio 1999) .................................................68

*State v. Drain,* 2020-Ohio-0652.............................................................................79

*State v. Fry*, 926 N.E.2d 1239 (Ohio 2010)..................................................... 43, 54, 68

*State v. Fry*, No. 26121, 2012 WL 2128027 (Ohio Ct. App. June 13, 2012).........44

*State v. Garrett,* 2019-Ohio-1381 .........................................................................79

*State v. Hunter,* 2007-Ohio-2021 ..........................................................................79

*State v. Jones,* 2008-Ohio-0525 ............................................................................79

*State v. Madison,* 2016-Ohio-1006 ........................................................................79

*State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992)....................................78

*State v. Osie*, 2010-Ohio-1105 ......................................................79

*State v. Short,* 2006-Ohio-1366 ....................................................79

*State v. Whitaker,* 2019-Ohio-1482 ................................................79

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................... *passim*

*Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012) ........................................29

*United States v. Cronic*, 466 U.S. 648 (1984) ..................... 16, 31, 43, 55

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)..........................18

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ....................61

*Washington v. Texas*, 388 U.S. 14 (1967) ........................................60

*Washington v. James*, 996 F.2d 1442 (2d. Cir. 1993) ..........................76

*Wiggins v. Smith*, 539 U.S. 510 (2003)......................................... 45, 46

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ......................... 64, 70

**Statutes**

28 U.S.C. § 2254 ................................................................... 55, 60

28 U.S.C.§ 2254(d) ............................................................. 15, 54, 67

28 U.S.C.§ 2254(d)(1)........................................................... 40, 52, 68

28 U.S.C. § 2254(d)(2)........................................................... 22, 40, 52

28 U.S.C.§ 2254(e)(1)........................................................... 40, 52

**Other Authorities**

ABA Guideline 10.9.1(E) ...........................................................20

ABA Guideline 10.9.1, commentary, p. 99 (2003) .................................20

ABA Guideline 10.9.2, commentary p. 102 (2003) ...............................20

Anthony G. Amsterdam, Trial Manual Five for the Defense of Criminal Cases (1988)......................................................................19

Fed. R. Civ. P. 8(b)(1)(A) ...........................................................74

Ohio R. App. R. 26(B) .............................................................78

Ohio S. Ct. Prac. R. 11(6 .........................................................78

**Rules**

Prof. Cond. R. 1.2 ................................................................ 39, 40

**Constitutional Provisions**

U.S. Const. Amend. V ..................................................................31

U.S. Const. Amend. VI. ............................................................ 17, 31

U.S. Const. Amend. VIII. ............................................................. *passim*

U.S. Const. Amends. XIV ..............................................................31

## __STATEMENT IN SUPPORT OF ORAL ARGUMENT__

Clarence Fry requests oral argument. This case involves substantial questions as to whether Fry's capital convictions and death sentences were obtained in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Oral argument will aid the Court in resolving these important questions.

## I.    PROCEDURAL HISTORY & STATEMENT OF FACTS

### A.    Introduction

Clarence Fry Jr.'s trial was tainted by the complete breakdown of the attorney-client relationship. A review of the record reveals that what should have been a trusting attorney-client relationship was anything but that. With his life on the line, Fry became increasingly frustrated, concerned, and disappointed by the lack of communication, effort, and respect on behalf of his attorneys. It is upon reviewing Fry's decisions throughout trial through this lens that the impact of trial counsel's ineffectiveness proves evident.

### B.    Relevant Procedural History

On August 30, 2005, Fry was indicted on charges related to the death of his ex-girlfriend, Tamela Hardison. The twelve-count indictment charged Fry with the following offenses: aggravated murder, along with two death specifications; murder committed during the commission of a burglary and murder to prevent testimony in another criminal proceeding. The indictment also included charges of aggravated burglary, domestic violence, intimidation of a crime victim, menacing by stalking, and tampering with evidence. (Indictment, R.13-1, PageID#75-81.) Fry was appointed two attorneys to represent him: Laurence Whitney and Kerry O'Brien. (Arraignment *Id*. at PageID#97, 102.) Fry's trial began on May 30, 2006, before an all-white jury. The State called 29 witnesses, while defense counsel called one

2

witness. The jury ultimately convicted Fry of all charges. (Trial Tr. R.14-1, PageID#6513-14.) At the penalty phase, Fry waived the presentation of mitigation and the court accepted that waiver. (R.14-2, PageID#6540.) Subsequently, Fry was sentenced to death. (*Id*. at PageID# 6646.)

Following his conviction and death sentence, Fry filed his direct appeal with the Ohio Supreme Court. (Fry Merit Brief, R.13-1, PageID#538.) The Supreme Court of Ohio denied his direct appeal on the merits but remanded for the trial court to implement post-release control. (*Id.*) Fry then filed an Application for Reopening his direct appeal based on ineffective assistance of appellate counsel during his initial direct appeal, but the Supreme Court of Ohio also denied this application on the merits. (Order, *Id.*at PageID#1430.) Fry timely filed a Petition for Post-Conviction Relief, an Amended Petition for Post-Conviction Relief, and a Second Amended Petition for Post-Conviction Relief. (PC Petitions, R.13-2, PageID#1469, 2635, 2704.) The trial court denied Fry's Petition. (Order, *Id.*at PageID#2710.)

Fry appealed the denial of his Petition. (Postconviction Appeal, *Id.* at PageID#2719.) The Ninth District Court of Appeals affirmed in part and reversed in part. (*Id.* at PageID#2755.) It denied relief as to most grounds for relief but remanded the case back to the trial court for a merit's ruling on Fry's Twelfth Ground for Relief, i.e., that he was denied the right to testify during trial. (*Id.*) Fry appealed

3

the denial of most of his grounds for relief to the Ohio Supreme Court, which declined to accept jurisdiction. (Order, R.13-3, PageID#3283.)

After exhausting all of his legal claims in state court, Fry filed his petition for a writ of habeas corpus on August 6, 2010. (Petition, R.21.) The District Court ultimately denied Fry's habeas petition but granted a certificate of appealability on six claims for relief. (Order, R.62.) His First Claim for Relief alleged ineffective assistance of counsel during the trial phase. Specifically, subclaim 1(A) alleged that trial counsel failed to adequately relay an offer of resolution to Fry. (Petition, R.21, PageID#7534.) Subclaim 1(B) alleged that trial counsel failed to allow Fry to exercise his constitutional right to testify in his own defense. (*Id*. at PageID#7538.) His Second Claim for Relief alleged ineffective assistance of counsel during the penalty phase, asserting that trial counsel abdicated its duty to ensure that Fry's mitigation waiver was made knowingly, voluntarily, and intelligently. (*Id*. at PageID#7554.) Fry's Tenth Claim for Relief alleged that the trial court failed to conduct an independent inquiry into trial counsel's assertion that Fry would forgo testifying on his own behalf. (*Id*. at PageID#7589.) The Eleventh Claim for relief alleged that the trial court erred in accepting Fry's waiver of mitigation. (*Id*. at PageID#6591.) And finally, Subclaim D of his Nineteenth Claim for Relief alleged that appellate counsel was ineffective in failing to raise trial counsel's ineffectiveness

for failing to adequately explain the plea offer proposed by the State. (*Id*. at PageID#7615.)

Now before this Court for review, Fry submits that these claims warrant relief from the District Court's dismissal.

### C.    Statement of Facts

#### 1.    Domestic dispute between Fry and Hardison

On July 18, 2005, Fry and Hardison were involved in a heated domestic dispute. Richard Hatcher, Fry's neighbor heard the incident through the thin walls of his apartment and called 911. (Trial Tr.,R.14-1, PageID#5585.) Shortly after arriving, the police arrested Fry and took him into custody. Fry was subsequently charged with assault and aggravated menacing.

That same day, Hardison went to the police station to seek a protection order. However, a protection order was not issued because Hardison never returned to court to enforce it. Hardison's other actions (or inactions) also made it clear she had no interest in testifying against Fry on these charges. Reid Yoder, the Akron city prosecutor handling the case, testified that he attempted to contact Hardison on several occasions and was never able to get in touch with her. (*Id.*, at  PageID#5901.) He also testified that Hardison never tried to contact him in any way to help prosecute the case. *Id*. A subpoena was issued for Hardison, and it went unreturned to the prosecutor.

Fry remained incarcerated at the Summit County Jail until July 25, 2005. Upon his release and return home, Fry realized that during the week he was incarcerated, Hardison had gained access to his apartment and stole numerous items. Fry was understandably upset. His landlord, David Rogers, testified that Fry specifically asked him why Hardison was given access to his apartment. (Trial Tr., R.14-1, PageID#5724-25.) Rogers explained that Fry was very upset and intent on reclaiming his stolen property.

After realizing that Hardison stole his property, Fry attempted to use the very system that would later abandon him. Fry went to the police station to file a report. Fry spoke with Officer Michael Brown and a detective with the Akron Police Department. At trial, Officer Brown testified that Fry wanted to file a report and get his personal belongings back. To file a theft report, Brown instructed Fry to go upstairs to the detective bureau. The detective bureau told Fry to go back downstairs and speak with a different department. Instead of working with Fry to file a report and locate his stolen property, the Akron Police Department passed him around the station from one employee to another. (Trial Exh.95, R.13-5, PageID#4110-11.) Due to the lack of assistance and seemingly carelessness of the police department, Fry was unable to file the theft report. However, this did not stop Fry from pursuing other avenues to retrieve his stolen belongings from Hardison.

In another attempt to resolve the matter of his stolen property, Fry spoke with Delores Knox, Hardison's mother, to no avail. Days before the murder, Fry attempted to speak with Hardison's federal probation officer, Douglas Stubbs, about what could be done to reclaim the property. Because Officer Stubbs was also looking for Hardison, he could be of no help. (Trial Tr., R.14-2, PageID#6744-47.) Fry also sought help from Judge Annalisa Williams' bailiff. But the bailiff could also offer no assistance. No one could help.

### 2.    Fry's confrontation of Hardison to retrieve his stolen property.

Fry eventually located Hardison at her daughter's apartment on July 31, 2005. Jasown Bivins, Hardison's grandson, was inside the apartment and told detectives that Fry and Hardison were arguing over the stolen property. At the time of the argument, Hardison was high on cocaine, which could have contributed to her exhibited aberrant behavior. (Trial Tr., R.14-1, PageID#6070,6077.) During the argument, Hardison grabbed an ashtray and hit Fry in the head. He was disoriented and saw stars. In response, Fry grabbed a knife from the kitchen and stabbed Hardison four times. (R.14-2, PageID#6227; R.14-1, PageID#6048.) Only one of the wounds was fatal. (*Id*. at PageID#6054.) Detectives at the scene would later testify that there was no sign of a forced entry at the apartment.

Immediately after the altercation, Fry fled to West Virginia, where he remained until his apprehension on August 3, 2005. He was extradited to Ohio on

November 3, 2005. Upon arrival, Fry provided investigators with a detailed account of the offense. Detective Michael Shaeffer testified that Fry told him that he went to the apartment to find his stolen property. (R.14-2, PageID#6224.) Fry admitted to killing Hardison, but stated there was no planning involved and he was acting in self-defense. Based on the events from July 18 and 31, 2005, the State indicted Fry on capital murder charges.

### 3. Deteriorated relationship between Fry and trial counsel

The seeds for a complete breakdown in the attorney-client relationship were planted early, beginning at arraignment. Fry is Black. The court appointed Larry Whitney, who is white, as Fry's lead counsel. Whitney was aware that Fry sought Black attorneys to represent him. (R.14-1, PageID#4280.) Whitney failed to address Fry's preference for Black counsel, and the court immediately appointed white co-counsel, Kerry O'Brien. In their very first meeting, Fry indicated to his court appointed attorneys that he did not trust them. (Fry Affidavit R.13-2, PageID#1519.) But that is how a lot of attorney-client relationships begin. The problem is that counsel did nothing to try to garner that trust. Leading up to trial, counsel's visits were short, and they did not listen to Fry's concerns.

Increasingly worried about his court-appointed attorneys, Fry sought new counsel by contacting the University of Akron School of Law's Legal Clinic. (Trial Transcript. R.14-2, PageID#6788-6789.) The legal clinic was not able to offer Fry

8

any advice after Kerry O'Brien informed the clinic that they were not to have contact with his clients. (*Id*.) Fry also wrote to Judge Mary Spicer to voice his complaints. (R.14-2, PageID#6825.) Ultimately, no one would help Fry in his efforts to receive new counsel.

As the trial approached, Fry's lack of faith, lack of trust, and anger continued to escalate. Fry's suggestions regarding his defense and witnesses that could be called were ignored or met with open hostility, and counsel belittled his desire to testify in his own defense. See Claim for Relief 1(B). Counsel used racial insults when discussing matters of trial strategy with Fry. (*See e.g*., R.14-2, PageID#6823.) His conversations with counsel were rife with hostility. This caused Fry's lack of faith, lack of trust, and anger to escalate. For all these reasons, Fry believed his attorneys had racist attitudes and were not interested in presenting his case with the effective representation the constitution provides. Fry continued his efforts to seek new counsel, even enlisting his mother's help. Fry was unsuccessful. With his life literally on the line, Fry was forced to go to trial with two attorneys whom he believed were untrustworthy, racist, and disinterested in presenting his side of the story.

**4.      Plea discussion with Fry and the continued deterioration of the attorney-client relationship.**

It was not until shortly before jury selection that trial counsel mentioned the State's  offered plea deal of thirty-years to life to Fry. (R.14-1, PageID#4494.) Even

9

then, counsel discussed the plea with him for less than an hour. (*Id*.) His counsel did not explain to Fry why accepting a plea would be a good idea. (Fry Affidavit R.13-2, PageID#1521.) At this stage of the proceedings, defense counsel were obviously aware that Fry had confessed to murdering Hardison. Counsel were also aware that the State had numerous witnesses and physical evidence ready to be admitted against Fry. Yet, despite that knowledge, defense counsel allocated a mere one hour to discuss this lifesaving plea offer with Fry. Moreover, counsel never enlisted the help of Fry's family or made any real attempts to thoroughly explain the implications of rejecting this plea offer with Fry. Finally, counsel never gave Fry sufficient time to properly consider the offer. (Troccoli Affidavit *Id.* at PageID#1531-92.)

Fry rejected the plea offer. He did not trust his counsel, and he was not convinced taking the plea offer was to his benefit. Fry was told nothing about conditions on death row. His counsel did not explain the differences between going to death row and spending time in general population. Counsel did not explain the death penalty appeals process. Counsel did not explain that there is a strong likelihood that he would not have success in getting a new trial in the appeals process. Had counsel acted reasonably, and had counsel explained these matters to Fry, he would have accepted the plea offer. (*Id*. At PageID#1521.)

After trial counsel ineffectively counseled their client about the plea offer, Fry's capital trial proceeded to voir dire. In preparation for Fry's capital trial, the

10

trial court summoned 100 prospective jurors to serve on the venire. (Trial Transcript.R.14-1, PageID#4372.) Only four African Americans were included in the first 45 members of the venire. Two of those African American jurors were excused, and one could not vote to impose the death penalty. (R.14-1, PageID#5068.) Fry told his attorneys and the judge that he was concerned there were very few African American jurors in the jury pool. It appeared to him that there would be no African Americans on his jury. Fry believed that his counsel and trial court did not care if there were any African Americans on his jury. This increased his frustration with his counsel and the trial as a whole. Fry raised these concerns directly to the trial judge, stating that he was concerned about the racial makeup of his jury, who he felt "don't have a clue what's going on in the projects." (R.14-1, PageID#5059-60.) Fry stated that he needed "somebody here that at least represents me in some way, shape, fashion, or form" because he was "fighting for [his] life." *Id*.

The trial court's only response was to summon the Jury Bailiff for Summit County, Debbie Ruggles, to place a statement on the record. (R.14-1, PageID#5231.) Ruggles stated that Fry's venire was culled from voter registration rolls. (*Id.*) Trial counsel accepted this response without further inquiry or objection. The inevitable consequence was a jury comprised of entirely white members. (*Id.* at PageID#5383.) Despite the Sixth Amendment's guarantee of a trial by one's peers, there was a clear absence of representation of African Americans. Nine white females and three white

11

males were selected to decide the fate of an African American defendant accused of murdering an African American female. Instead of addressing the discriminatory method employed to select the all-white jury or the significant under representation of African Americans in Fry's venire, the trial court praised the all-white jury for representing a "broad section of the community." (R.14-1, PageID#5240.) However, nothing in the juror questionnaires of the seated jurors revealed anything that would indicate that the seated jurors would understand Fry, the inner-city culture in which he lived, or the relationship between Fry and Hardison that was centered around drugs and economic disadvantages. (Juror Questionnaire R.13-2, PageID#1638.) Fry's confidence in his attorneys to ensure he received a fair trial depleted even more.

Once the trial began, Fry's lead trial counsel, Attorney Whitney, immediately conceded guilt to all charges within the first three sentences of his opening statement. Whitney stated he was there for a purpose and "I guarantee you probably the end of this week or next week, you will probably hear enough from me because the way O'Brien and I decided to handle this case here, it is my job here to work on the next phase of this trial." (Trial Transcript. R.14-1, PageID#5439-40.) Instead of using his opening statement as an opportunity to connect with the jury and make a strong first impression, Whitney simply conceded guilt on the charge of aggravated murder and at least one of the death specifications.

Not surprisingly, Fry's frustration escalated even more. Trial counsel elected not to contact witnesses Fry asked them to reach out to. If they were contacted, they were not presented as witnesses. Counsel never explained to Fry why they ignored investigating Fry's witnesses or engaged in any dialogue that gave Fry insight on their strategy. To Fry, it seemed that his appointed counsel offered no defense.

During the trial phase, counsel for Fry, who had a duty to challenge the State's case and advocate on his behalf, called just one witness. The witness was not even sure what time of day it was when she saw Fry. After presenting that sole witness on Fry's behalf, counsel requested a jury instruction on voluntary manslaughter. In support of this charge to the jury, counsel for Fry cited to State v. "whatever it is." (Trial Transcript. R.14-2, PageID#6323.)

Although Fry wanted to testify and told his family, his trial counsel, and the trial investigator his wishes, trial counsel precluded him from exercising this constitutional right. Fry was the only witness who could have explained what happened that fateful day. However, instead of presenting this critical testimony that would have supported their request for a voluntary manslaughter instruction, trial counsel misled the trial court and rested their case outside of Fry's presence. (R.14-2, PageID#6354.) The case went to the jury without ever hearing Fry's version of how the events of the homicide unfolded, to no fault of his own.

13

As expected under the circumstances, the all-white jury returned verdicts of guilty on all counts and specifications. At this point, Fry essentially gave up thinking that he could get a fair trial with the attorneys he was appointed and the all-white jury that seemed to simply stamp their approval on all the State's theories. The complete breakdown in the attorney-client relationship came to a boiling point. Things had deteriorated to such an extent between Fry and his attorneys that once the guilty verdicts were returned, Fry believed there was nothing else to say or do. When the court asked Fry about putting on witnesses in mitigation, he said he wanted to go right to the appeals process and secure a new trial. Fry's beliefs are indicative of a defendant without information as to the intricacies of how death penalty appeals operate. Fry stated, "I would prefer to skip all this and get straight to the sentence thing so we can go where we got to go so we can get back in here on appeal." (R.14-2, PageID#6544.) Such misinformed lay beliefs are the reason capital defendants have the right to the *effective* assistance of counsel. However, Fry's actions at this point displayed a defendant essentially acting on his own, without the advice of counsel.

Fry saw no reason to beg for his life or to put his family through a hearing. His counsel had nothing to say for him. They did not advise him about the legal consequences of not putting on mitigation evidence. His family would have supported the presentation of mitigation, and he would have credited their opinions.

14

If his counsel had put forth to explain the legal effect of not  presenting mitigating evidence in a way that was not insulting, condescending, or racist, Fry would have listened. He would have presented the available  mitigating evidence. (Fry Affidavit R.13-2, PageID#1519-1522.)

Due to Fry's uncounseled decision to waive mitigation, the jury returned with a recommendation of death. The trial court followed the recommendation and imposed sentenced Fry to death.

## ARGUMENT

## CLAIM FOR RELIEF 1(A)

**FRY WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS COUNSEL FAILED TO EFFECTIVELY COUNSEL AND RELAY THE STATE'S PLEA OFFER.**

Fry was denied effective assistance of counsel when his trial counsel failed to adequately relay an offered plea deal of thirty-years to life. His trial counsel failed to give him sufficient time to consider the State's plea offer; failed to effectively counsel him about the plea offer and about the consequences of proceeding with trial; and failed to obtain the aid of family, or others, including outside counsel, to convince him to take the plea offer. The District Court erred in finding that the state court decision that Fry failed to present evidence of prejudice was not based on an unreasonable determination of facts in light of the evidence, and an unreasonable application of federal law.

### A.    Rulings Below

The state court decided this claim on the merits. Therefore, the District Court's review was limited, pursuant to 28 U.S.C. § 2254(d), to a determination of whether the state court decision was contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence before the court.

16

The District Court rejected Fry's ineffective assistance claim, asserting that "Fry offers no evidence refuting the state court's findings except his own affidavit." (Opinion R.62, PageID#8299.) That court erroneously determined that "the state court reasonably found, Fry offers no credible evidence of prejudice that would "'demonstrate a reasonable probability [he] would have accepted the . . . plea offer had he been afforded effective assistance of counsel' – whether through more consultation with him or assistance from outside counsel and family members." (*Id*. at PageID#8300.) In sum, the District Court, adopting the Ohio Court of Appeals rationale, faulted Fry for allegedly failing to provide other evidence, besides his own affidavit, which would demonstrate that he would have accepted the plea deal if he had received adequate advice and consultation from his attorneys.

The Ninth District Court of Appeals of Ohio was the last state court to rule upon this issue. The Ohio appellate court erroneously determined that Fry was not entitled to relief because he did not establish prejudice.

Regarding the prejudice prong, the Ohio appellate court first determined that Fry was not "constructively" denied counsel such that he was not entitled to a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). Accordingly, it found that Fry was required to prove prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). The Ninth District acknowledged under *Lafler*

*v. Cooper*, 566 U.S. 156 (2012), the plea-bargaining phase was a "critical stage" in Fry's trial. (Decision, R.13-3, PageID#3249-50.)

The Ninth District rejected Fry's claim on the merits, finding he could not establish prejudice. It discounted Fry's post-conviction affidavit as "self-serving." (*Id.* at PageID#3251.) It erroneously extracted Fry's unwillingness to speak to family members about his mitigation waiver as evidence that "Fry did *not* want to consult with his family members about his decisions, and that he would not likely have been persuaded by his family members even if he had met with them about the plea offer." *Id.* (emphasis in original). Adopting facts wholly unrelated to his rejection of the plea offer to support its decision, the Ninth District held Fry could not establish *Strickland* prejudice.

### B.    Clearly Established Federal Law

Fry has a clearly established constitutional right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendment of the United States Constitution. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "This does not simply guarantee the mere existence of legal counsel but provides 'the right to *effective* counsel—which imposes a baseline requirement of competence.'" *Logan v. United States*, 910 F.3d 864, 868-869 (6th Cir.2018) (*quoting United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (emphasis

18

added)). "Under *Strickland's* two-part framework, a criminal defendant claiming ineffective assistance of counsel during plea negotiations must prove that (1) counsel's performance was deficient, i.e., that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,' and (2) the deficient performance actually prejudiced the defense." *Logan*, 910 F.3d 864, 868-869 *quoting Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The deficient performance prong is '"measured against an objective standard of reasonableness under prevailing professional norms."' *Id*. (*quoting Rompilla v. Beard*, 545 U.S. 374, 380 (2005)).

A defendant meets the prejudice prong by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The right to competent counsel exists not just during trial, but during critical pre-trial proceedings, including plea negotiations. *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). As this Court has identified, "[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case. . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." *Dedvukovic v. Martin*, 36 F.App'x 795, 797 (6th Cir. 2002)

19

quoting *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996) (*quoting* Anthony G. Amsterdam, Trial Manual Five for the Defense of Criminal Cases (1988)).

The criminal justice system in the United States is "for the most part a system of pleas, not a system of trials." *Lafler* v. *Cooper*, 566 U. S. 156, 170 (2012). "Against this backdrop, [the Supreme Court of the United States] has recognized that the loss of an opportunity for a favorable plea offer due to an attorney's deficient performance can violate the Sixth Amendment right to effective counsel." *Davis v. United States*, ___U.S.___, 143 S.Ct. 647, 647 (2023) (*citing Lafler,* 566 U.S. at 169-170).

In looking at the first prong of *Strickland*, and what is reasonably required by counsel, "defin[ing] the duty and responsibilities of defense counsel in the plea bargain process," the United States Supreme Court has observed, "[t]hough the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides." *Frye*, 566 U.S. at 145. Therefore, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are important directives explaining the duties and responsibilities of capital counsel in the plea bargain process.

Those guidelines instruct that "[c]ounsel's role is to ensure that the choice is as well considered as possible." ABA Guideline 10.9.2, commentary p. 102 (2003).

"This may require counsel to work diligently over time to overcome the client's natural resistance to the idea of standing in open court, admitting to guilt, and perhaps agreeing to permanent imprisonment." *Id.* "[A] client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest." ABA Guideline 10.9.1(E). The relationship that the defense team has established with the client and his or her family will often determine whether the client will accept counsel's advice regarding the advisability of a plea." ABA Guideline 10.9.2, commentar*y*, p. 102 (2003). "Counsel must often persuade the client ...a relationship of trust with the client is essential to accomplishing this." ABA Guideline 10.9.1, commentary, p. 99 (2003). "The entire defense team must work from the outset of the case with the client and others close to him to lay the groundwork for acceptance of a reasonable resolution." *Id.* "The defense team may also need to call on family, friends, clergy, and others to provide information that assists the client in reaching an appropriate conclusion." ABA Guideline 10.9.2, commentary, 102 (2003).

In addition to deficient performance, ineffective assistance of counsel in the context of plea offers, proving prejudice requires a demonstration that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. Specifically, Fry must show "a reasonable probability [he] would have

21

accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Frye*, 566 U.S. at 1409.

Moreover, this Court has explained that with regard to plea offers, in the context of the prejudice prong of ineffective assistance claims, that "[a]lthough some circuits have held that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence, we in this circuit have declined to adopt such a requirement." *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir 2003) (quoting *Dedvukovic v. Martin*, 36 Fed.Appx. 795, 798 (6th Cir.2002) (unpublished); *see Also Smith v. United States*, 348 F.3d 545, 551 (6th Cir.2003).

The *Griffin* court determined that if the defendant both attests that his attorney never explained the significance of the government's plea offer and there was a substantial disparity between the plea offer and the sentence rendered at trial, then there is a reasonable probability that the defendant would have pleaded guilty had they received effective assistance of counsel. *Griffin*, 330 F.3d at 738. Here, the disparity between the plea offer and the final rendered sentence is sufficient objective evidence to at least warrant an evidentiary hearing to determine whether Fry would have accepted the plea deal. *Id*. Where there is large disparity between the sentence offered in a plea deal and the sentence received, and the petitioner received ineffective assistance of counsel regarding said plea, it creates a rebuttable presumption of prejudice. *Id*.

**C.      Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance of counsel.**

Neither the Ohio appellate court nor the District Court determined that Fry failed to establish counsel's defective performance in conveying the plea offer. Both courts solely found that Fry failed to establish prejudice. Both courts erroneously indicated that Fry failed to produce evidence besides his own affidavit that established that had the plea deal been effectively conveyed to him, he would have accepted it.

The state court's decision on the merits of Fry's ineffective assistance claim was both an unreasonable application of clearly established federal law, and based on an unreasonable determination of the facts, in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (2). That court discounted the only facts before it that were relevant to the ineffective assistance of counsel as to the plea offer claim and extrapolated other facts from a claim unrelated to the issue before it: his ineffective assistance of counsel waiver of mitigation claim.

Fry's unwillingness to converse with his family members prior to waiving mitigation is completely irrelevant to his rejection of the State's plea offer prior to trial. Fry's relationship with his counsel and Fry's view of the case had drastically changed in the meantime. Additionally, Fry's unwillingness to speak to family at the mitigation stage has nothing to do with counsel's obligation to discuss the plea offer with him. It also has nothing to do with counsel's responsibility  to advise him to

accept it based on the realities of the case. The Ohio Court of Appeals' factual finding that Fry could not support his *Strickland* prejudice claim is clearly contrary to the facts in the state court record under AEDPA and was based on an unreasonable application of clearly established federal law.

### 1.   Trial counsel were ineffective in relaying the offered plea deal.

Trial counsel failed to develop a trusting relationship with Fry, and failed to discuss with him the obvious benefits of accepting the State's plea offer. The State of Ohio presented Fry's trial counsel with a plea offer of thirty years to life. Despite knowing the evidence was against their client, including Fry's admission to the murder, they sat on the offer for "a week or two" before presenting it to Fry. (Trial Transcript., R.14-1, PageID#4494.) When they did inform Fry of the plea offer, it was immediately before *voir dire* was to begin in his capital trial. (*Id.*) Counsel gave Fry a *mere 60 minutes* to make a life and death decision with the pressure of starting his capital trial bearing down on him. (*Id.*)

The state court record reveals that trial counsel knew their communication with Fry was poor at best. Counsel was acutely aware Fry did not trust them. Yet, counsel failed to get anyone, including outside counsel, who had experience with these types of plea issues, to assist them in convincing Fry to accept the plea offer. This was clearly deficient performance because Fry's relationship with his trial counsel was fraught with strain, and Fry had no level of trust with counsel. Had

counsel acted in accordance with the ABA Guidelines and prevailing professional norms, they would have employed tactics, including engaging with Fry's family, and obtaining the assistance of experienced outside counsel to explain the necessity of accepting the plea offer. If these steps had been taken, Fry would have accepted the State's offer. (Fry Affidavit, R.13-2, PageID#1521.)

Post-conviction counsel hired Attorney Kenneth Troccoli to review what occurred between Fry and his trial counsel. (Troccoli Affidavit R.13-2, PageID#1531-34.) Troccoli opined that the "apparent lack of any proactive, centralized, and meaningful communication between Fry, his family, and the appointed defense attorney ultimately contributed to the very deficient and prejudicial performance that our justice system and the Sixth Amendment strive to avoid." (*Id*.)

### 2.    **Fry's counsel's ineffective performance prejudiced Fry.**

#### a.    **The state court's decision was based on an unreasonable determination of fact.**

To deny this claim, the Ohio Court of Appeals relied on irrelevant facts from the mitigation phase of trial. This was error. There was a wealth of evidence to support the antagonistic relationship between Fry and his counsel—which directly led to Fry's refusal of the State's plea offer in this case. Moreover, by counsel's own admission, they devoted *a mere 60 minutes* to convincing Fry the plea offer was in his best interests. It was professionally deficient for counsel to only spend 60 minutes

conveying the plea offer to Fry where the consequences of going to trial included the penalty of death, and the plea offer not only would have saved Fry's life, but allowed for the possibility of future freedom from incarceration. It was clear from the state court record that Fry was unschooled in the law and the likelihood of his conviction. (*Id.*) Had counsel taken more time to explain the State's case and bring people with "knowledge of our life and what's going on," (Trial Transcript., R.14-1, PageID#5060.) to Fry, he would have listened to them. It should have been clear to counsel that although he did not trust his counsel, he trusted those with similar backgrounds and upbringings. Fry would have listened to his family and friends. The Ohio courts unreasonably ignored these facts when adjudicating this claim.

The Ohio appellate court also stated that Fry failed to present additional evidence, besides his own self-serving affidavit, to prove that he would have accepted the State's offered plea deal. However, that same court then ignored the additional objective evidence presented, apart from Fry's affidavit, which demonstrated that he would have accepted the plea offer had he received effective counsel.

Attorney Kenneth Troccoli reviewed Fry's dysfunctional relationship with trial counsel. The affidavit presented from Troccoli evidenced not only counsel's deficient performance, but also established that but for Fry and his counsel's strained relationship, there existed a reasonable probability that Fry would have accepted the

plea deal. (Troccoli Affidavit R.13-2, PageID#1531-34.) Troccoli explained that "[e]ffective communication with Mr. Fry and his family could have convinced him to take a deal in light of the fact that several incriminating statements had already been made and a conviction was likely. Had Mr. Fry's trial attorneys effectively addressed his concerns about race, the attorneys could have more effectively communicated their strategy, and worked with his family members..." (*Id*.). Therefore, the factual determinations made by the Ohio appellate court were unreasonable in light of the evidence presented in the state court proceeding. Fry did, in fact, present evidence other than just his affidavit to support the prejudice prong of the *Strickland* analysis.

The District Court likewise erred when it failed to consider this evidence, and instead denied Fry relief based on the erroneous determination that Fry's only evidence of prejudice was his own affidavit. (Fry Affidavit R.13-1, at PageID#1028-1031.)

> **b.    The state court's decision was based on an unreasonable application of federal law.**

The state court's decision was also an unreasonable application of clearly established federal law under *Strickland* and *Lafler*. The state court held that Fry failed to establish prejudice, describing his affidavit as "self-serving" and finding that Fry had failed to provide any other evidence to support that he was prejudiced

by counsel's actions. The District Court erred as a matter of law in upholding this determination.

First, Sixth Circuit law holds that in the context of ineffective assistance of counsel in plea negotiations a petitioner is not required to submit objective evidence beyond their own affidavit that they would have accepted a plea had they received effective assistance of counsel at that stage. *See Griffin,* 330 F.3d at 737 The logic underlying the holding in *Griffin* is sound. No one is in a better position to explain what they would have done in retrospect than the person who was tasked with deciding whether to take a plea deal had they received the effective assistance of competent counsel. This retrospective analysis is critical to determining whether a petitioner can establish prejudice in the context of ineffective assistance of counsel claims during the plea-bargaining process.

Here, Fry's affidavit is the best evidence of what Fry would have done had his counsel not been deficient in presenting the plea offer to him; he would have accepted the offered plea of thirty-years to life. Requiring additional objective evidence beyond a petitioner's sworn affidavit to establish whether petitioner would have accepted a plea offer, after receiving ineffective assistance of counsel, would essentially bar petitioners from obtaining relief ineffective assistance claims in the context of plea deals. Petitioners would have no recourse for this violation of their

Sixth Amendment rights to competent and effective counsel. The United States Constitution requires more.

In light of counsel's defective performance, the disparity between the plea offered and the sentence received establishes prejudice. (R.13-2, PageID#1521; Trial Transcript., R.14-1, PageID#4494.) The plea offer of thirty-years to life stands in stark contrast to his post-trial sentence: death. The Ohio Court of Appeals determination to the contrary was an unreasonable application of clearly established federal law. The disparity is indeed sufficient to demonstrate prejudice. Moreover, Fry presented additional evidence to demonstrate a reasonable probability that he would have accepted the offer had he received effective assistance of counsel in the form of his own affidavit, and that of Attorney Troccoli.

### D.    Conclusion.

Given the gross disparity between the plea offer and death sentence, Fry's attestation as to what he would have done had counsel rendered effective and competent assistance in advising him of the consequences of rejecting the plea offer, objective evidence from an outside expert that establishes counsel's performance was indeed defective, and a reasonable probability of a different outcome had Fry received effective assistance, Fry has established prejudice.

The Sixth Amendment to the U.S. Constitution guarantees criminal defendants the right to the assistance of counsel during their criminal

proceedings. *Strickland,* 466 U.S. at 684–85. This right extends to the plea-bargaining process, during which defendants are "entitled to the effective assistance of competent counsel." *Lafler,* 566 U.S. at 162. (internal quotation marks omitted). "[T]he right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Id*. At PageID#170.

Fry's counsel failed to fulfill their "clear obligation to provide sufficient advice to him during the plea-negotiation stage." *Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012). Trial counsel held Fry's life in their hands and squandered it. The state court's factual determinations were unreasonable, and its analysis of prejudice contravened the governing law. This Court should either grant him relief, order a new trial, or remand to the District Court with instructions to grant discovery and a hearing to prove that there existed a reasonable probability that Fry would have accepted the plea deal had he received effective assistance of counsel.

## CLAIM FOR RELIEF 1(B)

## TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY PREVENTED FRY FROM EXERCISING HIS CONSTITUTIONAL RIGHT TO TESTIFY IN HIS OWN DEFENSE.

At his capital trial, Fry's counsel unilaterally waived Fry's right to testify despite knowing that he wanted to testify in his own defense, substituting their will for his own. Trial counsel affirmatively misled the trial court concerning Fry's clear

wishes that he be permitted to testify in his own defense. Due to this deprivation of Fry's constitutional rights, he should be granted a new trial. The District Court erred when it agreed with the state court's decision that Fry's right to testify claim lacked merit. The District Court also erred in finding that the state court's decision was not based on an unreasonable determination of facts in light of the evidence, and an unreasonable application of federal law.

### A.    Rulings Below

Fry raised this claim as his Twelfth Ground for Relief in his Petition for Post-conviction Relief, which he filed in the Ohio Court of Common Pleas. (Post-Conviction Petition, R.13-2, PageID#1469, et. seq.). When the trial court denied relief on all of Fry's grounds for relief, the court denied Fry's Twelfth Ground, finding it was barred by res judicata. (Final Order, R.13-2, PageID#2710-18.)

On appeal to the Ohio Court of Appeals, Fry argued this ground for relief both individually and in the cumulative. (Merit Brief, R.13-3, PageID#3074-87.) The Ohio Court of Appeals denied almost all of Fry's claims but remanded his Twelfth Ground for Relief to the trial court for a ruling on the merits. (Decision, R.13-3, PageID#3245-67.) Upon remand and following a multiple-day evidentiary hearing, the trial court denied relief on this ground on the merits. (Order R.13-2, PageID#2882-2906.) The Ohio Court of Appeals affirmed that denial of relief, again reaching a merits' decision. (Decision, R.13-3, PageID#3756-73.) The Ohio

Supreme Court did not accept jurisdiction to hear this case; thus, the second decision of the Ohio Court of Appeals was the last reasoned state court decision that dealt with this specific ground for relief. (Order, R.13-3, PageID#3283, 3871.) As Fry asserted to the District Court below, this was contrary to, or an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in the state court. Despite this, the District Court also denied Fry habeas relief on this claim. (Order, R.62, PageID#8300-8310.)

The District Court found that the state appellate court "neither ignored nor discounted" the evidence presented in support of Fry's claim and points to the state court's conclusion that Fry failed to demonstrate that "he was actually *denied* his right to testify." (*Id*. at PageID#8309.)

### B.    Clearly Established Federal Law

The right to testify in one's own trial is "essential to due process of law in a fair adversary process" and is thus protected by the Fifth and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (quoting *Faretta v. California*, 422 U.S. 806, 819 (1975)). In addition, Fry had a clearly established constitutional right to the effective assistance of trial counsel. *See* U.S. Const. Amends. VI and XIV. *See United States v. Cronic,* 466 U.S. at 648, 659 (1984) (If counsel entirely fails to subject the prosecution's case to meaningful adversarial

testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable); *see also Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984) (a typical ineffective assistance of counsel claim has two components: (1) deficient performance and (2) prejudice; each must be proven to succeed on the claim.).

## C.    Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance of counsel.

One of Fry's trial counsel, Attorney Kerry O'Brien, met with Fry on December 1, 2005. (Trial Transcript, R.14-2, PageID#6776-78.) O'Brien's notes of that meeting include this statement: "Trial Tactics. Wants to Take Stand." (R.14-2, PageID#6777-78.) O'Brien testified that his notes meant that Fry wanted to testify in his own defense. (R.14-2, PageID#6779.) While this note was early in the preparations for trial, from this point forward Fry consistently and unequivocally expressed his desire to testify and tell his story, as only he could. Fry's insistence is consistent with trial counsel's own notes, and no evidence to the contrary was produced.

These notes were bolstered by the collective memories of three witnesses, each expressing that Fry repeatedly told them that he wanted to testify, throughout his time in jail and while awaiting trial. Specifically, Thomas Fields, Sharon Brandon, and Lawrence Fry all testified that Fry had told them of his desire to testify. (*See generally* R.14-2, PageID#6877-952.)

33

At the start of the trial several months later, in May 2006, Whitney revealed to Fry's jury in opening statement that Fry would testify in his own defense. (R.14-1, PageID#5441.) As the trial was ongoing, O'Brien again met with Fry, and again his notes reflect a discussion regarding Fry providing testimony at trial. (R.14-2, PageID#6779.) O'Brien testified that these notes meant it was unclear whether Fry wanted to testify in his own defense. (*Id*.)

The State rested on June 8, 2006, subject to the admission of its exhibits. (R.14-2, PageID#6230-34.) Court resumed on Friday, June 9, 2006, outside the presence of the jury. (R.14-2, PageID#6235.) The trial court noted that the defense may have evidence to present, but that "there is a witness that's en route and not here yet; is that correct?" (*Id*.) Whitney confirmed that the defense was awaiting the arrival of a witness. (*Id.*) The trial court decided to address the admission of the State's Exhibits and heard the defense's rule 29 motion for acquittal outside the presence of the jury. (R.14-2, PageID#6236-66.)

At that point, the trial court asked whether the defense was ready to present its case. (R.14-2, PageID#6277.) In response, Whitney said, "Wait one second, Judge." and despite the jury not being present in the courtroom O'Brien said, "I believe we are going to ask for a side bar." (*Id*.) The trial court responded, "Let's have a side bar conference." (*Id.*) At side bar, and outside of the presence of Fry, Whitney explained his problems with securing the attendance of witness "Mary

34

Reid" who had not yet appeared, even though it was then 10:45 a.m. and Reid was supposed to appear between 9:20 and 9:30. (R.14-2, PageID#6278-79.) Whitney explained the efforts the defense team had taken to secure Mary Reid's attendance. (*Id.*) To support the defense request to continue the trial so the defense could secure Reid's testimony, O'Brien said, "I can report to the Court that we were only going to have one witness for the defense, I can tell you *categorically* and *emphatically* that Fry, the defendant, is not going to testify." (R.14-2, PageID#6280 (emphasis added).)

The statement made by O'Brien to the trial court should be juxtaposed against the one that Whitney made in his opening statement to Fry's jury, and in Fry's presence. There, he said: "Clarence has been waiting a long time to come here and tell you what happened and why it happened, and have a jury determine his guilt and innocence." (R.14-1, PageID#5441.)

The defense proffered Reid's expected testimony, and the trial court attempted to confirm whether Reid was served with a subpoena. (R,14-2, PageID#6280-84.) Ultimately, the court agreed to continue the defense case to Monday morning. (R.14-2, PageID#6285.) Finally, while the jury was still out of the courtroom, the trial court ruled on the admission of defense exhibits. (R.14-2, PageID#6286-90.)

All of this occurred outside the presence of the jury, and Fry was neither present nor invited to the side bar to participate. At the end of the side bar, the record

reflects the trial court called the jurors back into the courtroom, informed the jurors that the trial would be in recess until Monday, June 12, 2006, admonished the jury, and formally released them for the weekend. (R.14-2, PageID#6290-92.)

On Sunday, June 11, 2006, O'Brien met with Fry at the jail, and again took notes of that meeting. Those notes indicate, "C.F. wants to testify! (Reasons given for not testifying)." (R.14-2, PageID#6780.) Those are the sole notes from that meeting, and those notes reflect the emphatic desire of Fry to take the stand.

On Monday, June 12, 2006, the trial court held an in-chambers meeting with counsel, again without Fry present. (Transcript of Proceedings R.13-5, PageID#4237-39; Trial Transcript., R.14-2, PageID#6312; R.14-2, PageID#6782-83.) The meeting initially discussed jury instructions. (R.14-2, PageID #6312-24.) The following colloquy then occurred between defense counsel and the trial court:

> THE COURT: Did your witness ever show up?
>
> WHITNEY: Yes, Your Honor. She's outside ready and raring to go. We have talked to Clarence over the last couple of weeks. I spent five or six hours invested talking to him, talking to the defendant about his testimony. *He has really not wavered. He's playing a little game, I think in my mind about it, but he has not wavered in his opinion that he would not testify today.* Kerry, I think, spent some time with him yesterday.
>
> O'BRIEN: Yes. Sunday morning I spent some time in the Summit County Jail with Fry, and he indicated that he did not want to testify."
>
> WHITNEY: And he was unequivocally against testifying Friday afternoon when we met with him in the courthouse upstairs. The

deputies had him available for us for an hour. We talked to him and he was unequivocally opposed to it, so.

THE COURT: All right. *If there was any vacillation*, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?

WHITNEY: That's correct.

(R.14-2, PageID#6784-85; reading from R.14-2, PageID#6324-25; Transcript of Proceedings R.13-5, PageID#4237-39 (emphasis added).)

It was incumbent upon counsel at that point to inform the trial court, at a minimum, that Fry had, in fact, at least vacillated and that the court should inquire on the record. Instead, they entirely misrepresented Fry's position to the court.

In his direct examination at the July evidentiary hearing, O'Brien admitted that, during this in-chambers meeting outside of Fry's presence, he and Whitney represented to the trial court that Fry did not want to testify in his own case. (R.14-2, PageID#6785.) As the quoted exchange makes clear, at trial, O'Brien and Whitney described Fry's decision not to testify as one that has not wavered, that Fry was unequivocal, and that Fry never vacillated about that decision. (Trial Transcript R.13-5, PageID#4237-39; R.14-2, PageID#6784-85.)

Yet, in the evidentiary hearing, O'Brien testified that Fry wanted to testify on December 1, 2005, was planning to testify when counsel made opening statement on June 2, 2006, was unsure (according only to O'Brien) whether he wanted to testify on June 7, 2006, and emphatically stated he wanted to testify on June 11,

37

2006. (R.14-2, PageID#6810-11.) Even O'Brien would describe Fry's desire to testify in his own defense as having vacillated between December 1, 2005 and June 11, 2006. (R.14-2, PageID#6811.) Nonetheless, trial counsel expressly misrepresented to the trial court that Fry had never vacillated and always denied any intention of testifying on his own behalf. (R.14-2, PageID#6324-25.) Had Attorneys O'Brien and Whitney given the court an honest recitation of Fry's position on his testimony, the court would have inquired of Fry on the record as the court stated it was inclined to do, and Fry would have told the court he wanted to testify.

At the evidentiary hearing, prosecutor Angela Walls-Alexander made factual representations to the trial court regarding the events of June 9, 2006. Walls-Alexander argued that O'Brien's side bar statements to the trial court—that he could tell the trial court "categorically and emphatically that Fry, the defendant, is not going to testify"—were statements made in open court and thus were made in the presence and hearing of both Fry and all court spectators. (R.14-2, PageID#6785-86.) The trial court then called Walls-Alexander to testify about the circumstances regarding the presentation of the defense case. (R.14-2, PageID#6786.)

Walls-Alexander testified that O'Brien's statement "absolutely was said in open court in front of the defendant." (R.14-2, PageID#6957.) From that premise, Walls-Alexander argued that Fry must have known that his attorneys waived his right to testify and, from Fry's silence, the court could infer Fry's approval of that

waiver. It was not until cross-examination that Walls-Alexander admitted "side bar" means conversations held at the bench between the attorneys and the Judge. (R.14-2, PageID#6958-59.) A defendant is not privy to those conversations. (*Id*.)

There is only one logical reason why trial counsel would ask for a sidebar conference at a time when the jury has already been excused: trial counsel wanted to communicate something to the court outside the hearing of others in the courtroom, particularly their client.

Here, the information that trial counsel sought to conceal was their unilateral decision to waive Fry's right to testify in his own defense. By doing this, they affirmatively misled the court into thinking that it was Fry's decision not to testify, when in fact counsel was making that decision independently and contrary to Fry's wishes. The circumstantial evidence all points to this conclusion. Lawrence Fry did not hear O'Brien's statement (R.14-2, PageID#6947-48.) Clarence Fry did not hear O'Brien's statement. (R.14-2, PageID#6970.) The record reflects this statement took place at side bar where Walls-Alexander was also present. (R.14-2, PageID#6280; s*ee generally,* R.14-2, PageID#6277-91.) The only logical conclusion is that the transcript is accurate, and this was an actual "sidebar," which was held at the bench with the Judge and counsel present, and out of the earshot of Fry and his brother.

In sum, trial counsel's notes show that Fry wanted to testify six months before trial and that he repeatedly told trial counsel of that desire. (Handwritten Notes R.13-

39

3, PageID#4258, 4259, 4260; *See* testimony of Clarence Fry *generally* Trial Transcript R.14-2, PageID#6815-56.) Trial counsel told the jury in opening statement that Fry would testify. (R.14-1, PageID#5441.) The most compelling proof is trial counsel's own note of his interview with Fry the day before the defense case began. (Handwritten Notes R.13-5, PageID#4260.) Those notes show that Fry informed his attorneys that he wanted to testify a mere 24 hours before trial counsel told the trial court the exact opposite. (Trial Transcript R.14-2, PageID#6324-25; R.14-2, PageID#6810-11.) Trial counsel knew that if the court made an inquiry, Fry would assert his right to testify. To prevent that inquiry, trial counsel misled the trial court concerning Fry's wishes and denied him his right to make an informed decision whether to testify in his own defense. Trial counsel then rested their case at a sidebar conference again outside of Fry's presence. (R.14-2, PageID#6280; s*ee generally,* R.14-2, PageID#6277-91.) Finally, in Fry's own testimony, that of his family members and trial investigator all support Fry's intention to testify in his own defense. (R.14-2, PageID#6820, 6828; R.14-2, PageID#6880-6972.)

Whether it was prudent for Fry to testify was not trial counsels' decision to make, nor was it something the trial court could consider. Similarly, it is not something for this Court to consider. Rather, Fry, and Fry alone, had the legal power to make the decision whether he would testify in his defense or waive the right to testify. *Rock,* 483 U.S. at 51; *Faretta*, 422 U.S. at 819. *See also,* Prof. Cond. R.

1.2(a): "A lawyer shall abide by the client's decision as to … whether the client will testify." Here, trial counsel subverted that right.

Moreover, Fry was an essential witness to his defense case. Fry's testimony was the only way trial counsel could support their request of a voluntary manslaughter instruction. Fry asked his trial counsel to interview and present other witnesses on his behalf. (R.14-2, PageID#6824-25, 6833-34.) But his counsel did not heed his requests. From the defense perspective, Fry was the sole witness left to explain what happened. This prejudiced Fry.

### D.    District Court Erred in Denying Fry Habeas Relief

A federal court may grant habeas relief on a claim when the merits were adjudicated in state court if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The state court's factual determinations are presumed correct unless the petitioner shows clear and convincing evidence of error. *Id*. § 2254(e)(1). Here, the decision by the Ohio appellate court was contrary to, or an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in the state court. A review of the evidence

from Fry's post-conviction evidentiary hearing, as outlined above, clearly and convincingly shows that the state court erred in finding that Fry failed to show he was denied his Sixth Amendment right to testify. *See also*, Claim for Relief 10, *infra*.

Despite this, the District Court below also denied Fry habeas relief on this claim. (Order, R.62 PageID#8300-8310.) The District Court found that the state appellate court "neither ignored nor discounted" the evidence presented in support of Fry's claim and points to the state court's conclusion that Fry failed to demonstrate that "he was actually *denied* his right to testify." (*Id*. at PageID#8309.) But that finding was erroneous. Any fair-minded jurist would recognize without question that Fry's counsel ignored Fry's wishes, misled the trial court, and actively prevented Fry from exercising his constitutional right to testify in his own defense.

Accordingly, this Court should reverse and instruct the District Court to grant Fry's habeas petition.

## CLAIM FOR RELIEF 2

**TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY ALLOWED FRY TO WAIVE HIS RIGHT TO PRESENT MITIGATION EVIDENCE. BECAUSE TRIAL COUNSEL DID NOT INFORM FRY OF THE CONSEQUENCES OF WAIVER, THE WAIVER WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT.**

As summarized above in Claims for Relief 1(A) and 1(B), the seeds for a breakdown in the attorney-client relationship were planted early. By the end of the first phase of his trial,  Fry had a complete lack of trust in his court-appointed

42

attorneys. Thus, when confronted with the life of death decision on whether to proceed to present mitigation, Fry made the uncounseled and uninformed decision to waive that presentation.

Fry made this uncounseled decision because his counsel had failed to explain to Fry the ramifications of this waiver. For instance, counsel failed to explain fully how unlikely it was the Ohio Supreme Court would overturn the jury's sentencing decision. Counsel also failed to provide Fry with a definition of "aggravating circumstance" under Ohio law, how a jury finds aggravating circumstances in a capital trial, and the slim chances that the jury's verdict would be overturned on appeal. Counsel never explained to Fry that he could make an unsworn statement to the jury. This culmination of counsels' failures to provide legal assistance and counsel to their capital client led directly to Fry's waiver waived of his constitutional right to present mitigation, which, in turn, prejudiced the outcome of Fry's mitigation phase and led to his death sentence. The District Court erred in both failing to adjudicate this claim and in denying this claim on the merits.

## A.    Rulings Below

Fry raised this claim in part on direct appeal to the Ohio Supreme Court as Proposition of Law II. (Merit Brief R.13-1, PageID#583.) He asserted the breakdown of the attorney-client relationship *caused* Fry to waive mitigation in the hopes that "this Court and other reviewing courts could review the evidence. This

was not a 'volunteer situation.' The waiver was the act of a man who believed that he had not committed a death eligible offense." (*Id*. at PageID#582.)

Although the Ohio Supreme Court addressed Fry's mitigation waiver claim regarding the sufficiency of the trial court's colloquy and its finding that the waiver was knowing, voluntary and intelligent, the Ohio Supreme Court did not discuss Fry's claim alleging trial counsel's ineffectiveness directly leading to Fry's waiver. Rather than addressing the ineffective counsel claim Fry alleged, the Ohio Supreme Court instead addressed whether the trial court was deficient in inquiring into the attorney-client relationship, as follows: "Fry argues that the trial court improperly accepted his waiver of mitigation because it failed to inquire into the breakdown of the attorney-client relationship. As discussed above, there was no evidence of a breakdown in Fry's relationship with his counsel necessitating further inquiry." *State v. Fry*, 926 N.E.2d 1239, 1270 (Ohio 2010); (Decision Denying Dismissal R.13-1, PageID#927.)

Fry also raised this claim in post-conviction proceedings, supported by evidence *de hors* the record, in his Thirteenth Ground for Relief.[1] (Post Conviction

---

[1] Fry presented evidence in support of his claim, including: (1) the testimony of his trial counsel, some of which indicated racial animus towards Fry, (2) affidavits from his family attesting to the testimony they would have offered in mitigation at trial, (3) his own affidavit attesting to how his trial counsel's ineffective assistance resulted in him waiving mitigation, (4) affidavits from attorneys discussing professional norms in capital representation. (Tr. R.14-2, PageID#6727; R.13-2, PageID#1577-1592; 1519-1522;1523-1534.)

Post-Conviction Petition R.13-2, PageID#1511.) In that ground, Fry argued *United States v. Cronic*, 466 U.S. 648 (1984), permits courts to presume prejudice in instances where counsel actually or constructively have abandoned their client at a critical stage of a criminal defense trial. (*Id*.)

The post-conviction court rejected Fry's arguments. On appeal, the Ninth District Court of Appeals in Ohio affirmed, finding first that, to the extent this claim was raised on direct appeal, it was barred by *res judicata*. *State v. Fry*, No. 26121, 2012 WL 2128027, at *5 (Ohio Ct. App. June 13, 2012). It further found *Cronic*'s presumption of prejudice did not apply, summarily concluding that Fry was not entitled to the presumption because counsel's conduct did not "rise to the level of *Chronic*['s]" actual or constructive lack of counsel. *Id.* at *4. Finally, it held Fry could not prove prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), and the claim was therefore without merit. *Id.*

## B.     Clearly Established Law

The Sixth and Fourteenth Amendments guarantee the accused the right to counsel at trial. *Gideon v. Wainwright*, 372 U.S. 335, 342-45 (1963). When an attorney demonstrates hostility towards his own client, he has in effect "abandon[ed] his duty of loyalty" such that *Cronic* applies and the courts "dispense[] with the necessity of a separate showing of prejudice." *Rickman v. Bell*, 131 F.3d 1150, 1159 (6th Cir. 1997). The test for judging trial counsel's effectiveness is found in

45

*Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, this Court must first determine if counsel's performance was deficient and whether the defendant suffered prejudice from counsel's errors or omissions. *Id.* at 686-87.

For *Strickland*'s deficient performance prong, the proper measure of counsel's performance is reasonableness under prevailing professional norms. *Id.* at 688. In a capital case, trial counsel's responsibilities are magnified by the extreme finality of the death penalty. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

For *Strickland's* prejudice prong, the habeas court must weigh any mitigating evidence presented to the state courts in the aggregate to determine its collective weight relevant to the aggravating circumstances proved at trial. Prejudice based on counsel's inadequate representation in the mitigation phase of a capital trial is established when there is a reasonable probability that at least one juror would have acquitted the defendant of the death penalty based on the collective weight of the mitigation evidence. *Wiggins*, 539 U.S. at 537. Here, Fry can demonstrate a reasonable probability of a different outcome in the mitigation phase based on the "totality of the [mitigating] evidence . . . adduced at trial . . . and . . . adduced in the habeas proceeding." *Id*. at 536 (internal citation omitted).

### C. Merits: Fry has demonstrated that he was deprived of his constitutional right to the effective assistance of counsel.

Fry's trial counsel never attempted to develop a relationship with their client. The ABA Guidelines require counsel in a capital case to make every effort to

develop a trusting relationship with a client during the stressful time of trial when the client's life is literally at stake. (Post-Conviction Petition *Id.* At PageID#1524) (citing ABA Guideline 1.1); *Wiggins*, 539 U.S. at 511. Counsel failed to take any measures to know or develop a deeper understanding of their client—acts that would have been essential to strengthening or creating a trusting relationship with Fry. Here, in fact, counsel went the other way, driving a wedge between themselves and their client by failing to listen to the straightforward wishes of their client, who only sought to tell his side of the story (see Claim for Relief 1(B)), and by failing to sufficiently convey a life-saving plea offer (see Claim for Relief 1(A)) or explain life-saving mitigation to their client.

When Fry asked his counsel to explain the strategy behind his legal defense he was met with a blatant racially stereotypical response. In response to his inquiry, Attorney Whitney replied, "if he needed to know where to find a crack house and how to conduct himself once in said crack house," he would contact Fry. (R.13-2, PageID#1520; Trial Transcript R.14-2, PageID#6727; *Id.* at PageID#6818.) But when it came to legal strategy, Whitney explained that Fry was out of his league. (*Id.*) Understandably, Fry considered this comment to be racist and disparaging towards him.

Had trial counsel made any meaningful effort to develop a relationship with Fry, they would have learned that circumstances and events in Fry's upbringing

made him mistrustful of white people. For example, they would have learned that Fry's mother told her children at an early age that Santa Claus was not for Black children. (Ethal Fry Affidavit, R.13-2, PageID#1581) ("[N]o white man in a red suit is going to give anything to Black children."). Additionally, after Fry's father passed away, his sister's boyfriend, Eric Watson, became a father figure to him. (Trial Transcript R.14-2, PageID#6817.) Watson taught Fry "to be careful and weary of white folks." (*Id.* at PageID#6818.) Due to trial counsel's abject failure to develop any sort of attorney-client relationship with Fry, trial counsel's relationship with Fry was shaky at best and, because counsel neither learned about Fry's upbringing, nor attempted to overcome any racial barriers that existed between them, trial counsel never earned Fry's trust.

The fact that trial counsel did nothing to foster a trusting relationship with Fry led to Fry's skepticism, and rejection of counsel's legal advice and strategic decisions throughout the trial. The trial record is replete with instances of the breakdown of the attorney-client relationship, which reached its zenith after the jury convicted Fry. After the jury convicted him, Fry instructed his trial counsel to file a motion to waive any presentation of mitigation. (R.14-2, PageID#6540.) Trial counsel complied with this request and the trial court conducted a colloquy to determine if Fry's waiver was knowing, voluntary, and intelligent. (*Id.* at PageID#6540-6571.)

48

It was at this point that trial counsel's failings rendered Fry's waiver of any mitigation presentation to be unknowing. Counsel failed to provide the most basic advice to Fry regarding Ohio death penalty laws and Fry's rights contained therein. (Fry Affidavit, R.13-2, PageID#1521.) Trial counsel made little to no attempt to dissuade Fry from his decision. Competent counsel should have asked the court for a continuance of the mitigation phase of the trial so that every effort could have been made to persuade Fry to pursue a different course of action. Counsel should have brought in members of Fry's community, other experienced attorneys, and family members to speak with him.

Fry asserts three different claims of trial counsel's failures that, if taken individually or cumulatively, demonstrate that their performance was deficient so as to deny Fry the effective assistance of counsel.

First, trial counsel failed to fully explain to Fry appellate review and the serious ramifications of not presenting mitigating evidence during the penalty phase of his trial. On several occasions during the trial court's waiver colloquy, Fry discussed his desire to be sentenced so that he could move directly to his appeal to the Ohio Supreme Court. He believed that once the Ohio Supreme Court understood what had occurred at his trial, his convictions would be reversed, allowing him not only to retry the case before a different jury, but reversing his death sentence. (Trial Transcript R.14-2, PageID#6544; Fry Affidavit R.13-2, PageID#1521.) ("I would

prefer to skip all this and get straight to the sentence thing so we can go where we got to go so we can get back in here on appeal."). Fry made clear on the record his misunderstanding of the appellate process. (Trial Transcript R.14-2, PageID#6548.) ("Thank God we got a safety net called the Supreme Court and the Court of Appeals.").

Trial counsel was well aware that Fry was extremely focused on appealing his case, and that their client misunderstood the appellate process. Yet, counsel never explained to him that there was a "strong likelihood" that he would be unsuccessful on appeal. (R.13-2, PageID#1521.)

It was imperative for Fry's trial counsel to explain to him that it is highly unusual for capital convictions to be overturned on appeal. While Fry superficially understood he was waiving the right to present mitigating evidence, it is clear from the record he did not comprehend the consequences of that decision: That the mitigation hearing was, in all likelihood, his foremost opportunity to stave off a death sentence. Fry did not understand, as he could not without a detailed explanation from counsel, what is the standard of review on appeal and how deferential appellate courts are to a jury's factual findings. Without explaining this critical information to Fry in a way that he could understand and in a manner that did not disparage him or his race, trial counsel induced Fry's unknowing waiver of the mitigation hearing. Had counsel explained the legal ramifications of foregoing

the mitigation hearing, Fry would not have waived that presentation. (Fry Affidavit R.13-2, PageID#1522.)

Next, it was clear from the trial court's colloquy with Fry that he believed he was being sentenced to death based on the misdemeanor charge of domestic violence. He stated incredulously, "There's no way I can have my family come up here and say nothing to these people. . . . They say I killed Tammy because of a misdemeanor. They found 12 people to say that?" (Trial Transcript, R.14-2, PageID#6547.)  This was another clear indication of his mistrust of the system, which was exacerbated by trial counsels' lapse in clarifying that the jury's finding of the felony-murder specification of killing Hardison during the commission of an Aggravated Burglary alone was a sufficient basis to sentence him to death. Without understanding the jury's verdict and its impact on the appellate proceedings that come after it, Fry could not make a knowing, voluntary, and intelligent waiver of the mitigation hearing. Had counsel explained Ohio's death penalty statutes and how Fry was charged pursuant to them, he would have agreed to present mitigation evidence. (Fry Affidavit, R.13-2, PageID#1521.)

Last, trial counsel failed to explain that even if Fry did not want to present evidence through his family members or expert testimony, he had the right to make an unsworn statement to the jury. Trial counsel had a fundamental obligation to explain Fry's ability to testify, unsworn or otherwise. Counsel's failure to explain

51

this fundamental right to Fry during his capital proceeding means his waiver of the mitigation hearing was made unknowingly and unintelligently.

Because trial counsel did not want Fry to testify, *see* Claim for Relief 1(B), *supra*, it follows that they failed to advise him of this fundamental right to take the stand and testify, albeit unsworn, to save his own life. Trial counsels' failure to explain to Fry his right to make an unsworn statement during the mitigation hearing prejudiced Fry's decision to waive mitigation—and therefore the jury's decision to sentence him to death.

### D.    District Court Erred in Denying Fry Habeas Relief

A federal court must grant habeas relief on a claim when a state court's adjudication of the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented[.]" 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are rebutted by clear and convincing evidence of error. *Id*. § 2254(e)(1). Here, the decision by the Ohio appellate court was contrary to, or an unreasonable application of, clearly established federal law. Likewise, it was based on an unreasonable determination of the facts in light of the evidence presented in the state court.

The Ohio courts failed to adjudicate Fry's Sixth Amendment ineffective assistance of counsel claim. The District Court erred in its finding that Fry did not fairly present this claim to the state courts. (Order R.62, PageID#8318-19.)

### 1.    District Court Adjudication of Supreme Court of Ohio Decision

The Ohio Supreme Court did not directly address whether counsel's failure to educate and inform Fry about death penalty jurisprudence in Ohio rendered his waiver of a mitigation presentation to be unknowing and unintelligent. To be sure, the majority of Fry's briefing focused on his argument that the trial court erred. (*See* Merit Brief, R.13-1, PageID#583-86.) Nonetheless, Fry asserted that counsel failed to explain the appeals process in capital cases and how a jury finds aggravating factors leading Fry to mistakenly believe he easily could obtain a re-trial on appeal. (*Id.*) Likewise, Fry unequivocally raised his ineffective assistance of counsel claim as a Sixth Amendment claim. (*Id.* at PageID#586.) That was sufficient to fairly present his claim to the Ohio Supreme Court. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Thus, the district court erred in its finding that the Sixth Amendment claim was not fairly presented to the Ohio Supreme Court. (R.13-1, PageID#583-86.)

The Ohio Supreme Court failed to adjudicate Fry's claim on the merits. Although there is a presumption that the Ohio Supreme Court adjudicated his claim on the merits, here it is rebutted by evidence that the Ohio Supreme Court overlooked

the claim. That court addressed the due process aspect of Fry's claim, but not his allegation of Sixth Amendment ineffective assistance of counsel. *Fry*, 926 N.E.2d at 1269-72. Nor did the Ohio Supreme Court discuss any relevant state law principles incorporating the right to the effective assistance of counsel. *But cf. Johnson v. Williams*, 568 U.S. 289, 304-05 (2013) (state court did not overlook claim because considered state law which itself decided a question with the relevant "federal constitutional dimensions"). Likewise, while sharing some facts, the due process and Sixth Amendment ineffective assistance of counsel claims were legally distinct with legally distinct standards. *But cf. id.* (claim not overlooked where legal claim not mentioned is "so similar" to state law claim the state court considered). Likewise, because the court addressed Fry's other ineffective assistance of counsel claims—including many adjudicated in a perfunctory manner—the Ohio Supreme Court did not find that claim "too insubstantial to merit discussion" where it adjudicated the other claims. *But cf. id.*; *Fry*, 926 N.E.2d at 1277-78. Because the Ohio Supreme Court overlooked the claim, Fry is entitled to de novo review. *Johnson*, 568 U.S. at 292-93. Yet, even if the Court applies § 2254(d) deference, Fry is entitled to relief.

### 2. District Court Adjudication of Ninth District Court of Appeals Decision

Fry demonstrated in his post-conviction claim that trial counsel failed to take necessary steps to dissuade him from his waiver of mitigation presentation. In Fry's case, the attorney-client relationship lacked the necessary trust to engender Fry's

confidence in his attorney's advice. Fry was effectively abandoned at this stage of his proceedings, leaving him to make uninformed legal decisions on his own.

Additionally, counsel's performance was not just deficient under the first prong of the *Strickland* standard but also led to prejudice in that Fry did not have any mitigation presented to the jury on his behalf—resulting in a death sentence. Had counsel taken the appropriate steps and actions, Fry would not have waived the presentation of evidence during that critical part of his trial, and a multitude of mitigation would have been presented.

The Ninth District Appellate Court's denial of Fry's claims of ineffective assistance of counsel in failing to dissuade Fry from his waiver were contrary to or an unreasonable application of clearly established case law from the United States Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254.

### a.    *Cronic* **Claim**

The District Court's determination that the Ohio Appellate court's finding that *United States v. Cronic* did not apply to Fry's claim was incorrect. The District Court minimized the extent to which the attorney-client relationship had completely broken down, stating "to whatever extent Fry's counsel failed to maintain a cordial and trusting professional relationship with Fry, and more specifically failed to persuade him to present mitigation evidence, their shortcomings were not of the

'magnitude' necessary to demonstrate a constructive denial of counsel." (Order, R.62, PageID#8320.) (citing *Cronic*, 466 U.S. at 659). Evidence presented with Fry's post-conviction petition shows clearly and convincingly that the relationship was more than just strained, but barely existent.

The Court's reliance on the trial court's observation that during the trial phase of his trial Fry seemed able to communicate with his counsel is separate from the breakdown evidenced when Fry sought and proceeded to waive his mitigation presentation. By the mitigation phase, Fry's frustration with his counsel had reached a boiling point. He had tried to communicate during the trial, but he was shut down and denigrated at every turn. By the mitigation phase, Fry had given up and had no trust in his counsel, and counsel did nothing to instill confidence in Fry to accept their advice.

The District Cout's finding that the state court reasonably applied *Cronic* was incorrect. Likewise, because trial counsel evidenced hostility towards Fry, as evidenced by trial counsels' vocal and derogatory racial stereotyping of Fry, they had effectively abandoned their duty of loyalty. *Rickman*, 131 F.3d at 1159. Trial counsels' performance rose to the level of an abandonment, and a presumption that he was prejudiced by their representation should have applied herein.

56

**b.**   ***Strickland* Claim**

The District Court's finding that Fry could not show that the state court's rejection of his *Strickland* claim in "any respect" was unreasonable is likewise incorrect. (R.62, PageID#8323.) As discussed above, Fry has established that his counsel were ineffective when they failed to explain appellate review and the ramifications of waiving mitigation, failed to correct Fry's lack of understanding of aggravating circumstances for purposes of death eligibility, and failed to explain that Fry could make an unsworn statement during the mitigation phase of his trial. *See* Claim for Relief 1(A), *supra*. Counsel's dereliction of duty rendered their performance constitutionally deficient, and left Fry to make a waiver that was not knowingly, voluntarily, or intelligently made. Trial counsel's errors of this magnitude were by extension prejudicial to Fry.

Had trial counsel acted professionally reasonable, there is abundant mitigation that would have been presented. For example, information about the racism Fry endured as a youth and how African Americans generally experience race in the United States—which is particularly essential because Fry's jury was entirely made up of all white jurors mostly from the suburbs and not inner-city Akron—could have been presented. This would have also included evidence regarding the abuse that Fry witnessed and he himself endured at the hands of his father as a child. Evidence of this nature would explain how this abuse shaped his subsequent behavior in adult

relationships, particularly with women. (Ethel Fry Affidavit; Stinson Affidavit; R.13-2 Page ID#1577-1592; 2642-2643.)

The State introduced a wealth of examples about Fry's past relationships in which he became violent. Any information that could explain the origin of this behavior would have humanized Fry to the jury, and changed at least one juror's vote away from death.

Counsel's actions, and failure to provide competent representation, unquestionably prejudiced Fry. Given the wealth of compelling mitigation that would have shed a completely different light on Fry's actions and behavior, at least one juror would have found that the mitigating factors outweighed the aggravating circumstances.

### E.    Conclusion

Fry's trial counsel failed utterly in their duty to effectively represent and advise Fry, leading to Fry's waiver of the critical presentation of mitigation evidence. Through this deficient performance of his trial counsel, Fry was denied his rights to effective representation, as guaranteed by the Sixth and Fourteenth Amendments. Accordingly, this Court should reverse and instruct the District Court to grant Fry's habeas petition.

## CLAIM FOR RELIEF 10

## THE TRIAL COURT VIOLATED FRY'S RIGHT TO TESTIFY IN HIS OWN DEFENSE WHEN THE COURT FAILED TO CONDUCT AN INDEPENDENT INQUIRY OF FRY.

The trial court violated Fry's Sixth Amendment right to testify in his own defense when it failed to conduct an independent colloquy of Fry and instead moved forward with his trial based on statements made by trial counsel. See Claim for Relief 1(B). The trial court failed to conduct any sort of inquiry of Fry, instead choosing to rely solely on counsel's representations. This was a fundamental constitutional error, particularly when Fry was not even present for the discussion between the court and trial counsel, or when trial counsel rested the defense case-in-chief. The state appeals court unreasonably determined that this error was harmless beyond a reasonable doubt.

### A.    Rulings Below

Fry raised this claim in Proposition of Law IX in his Direct Appeal to the Ohio Supreme Court. (Merit Brief, R.13-1, PageID#619-21.) The Ohio Supreme Court specifically found: "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Decision Denying Dismissal R.13-1, PageID#916-17.) The court went on, finding that "Nothing in the record suggests that Fry wished to testify but was denied the opportunity to do so." (*Id*. At PageID#917.) Although there arguably may have been

little in the record before that specific court at that time, it was only because trial counsel affirmatively misled the court. *See* Claim for Relief 1(B) *supra*. In addition, there were red flags apparent in the record that the trial court should have acted upon; yet the court stayed silent. Thus, this decision was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254.

### B.    Clearly Established Federal Law

The right to testify in one's own defense has sources in multiple provisions of the United States Constitution. Specifically, it is one of the rights that "are essential to due process of law in a fair adversary process." *Faretta v. California* 422 U.S. 809, 819 (1975).

A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense – a right to his day in court – are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel. *In re Oliver*, 333 U.S. 257, 273 (1948). The Compulsory Process Clause of the Sixth Amendment grants a defendant the right to call "witnesses in his favor." This right extends to the states through the Fourteenth Amendment. *Washington v. Texas*, 388 U.S. 14, 17-19 (1967). The accused can call a witness, including himself, whose

testimony is "material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *see also Rock v. Arkansas*, 483 U.S. 44 (1987). The right to testify is also part of the Fifth Amendment's protection against compelled incrimination. *See Harris v. New York*, 401 U.S. 222, 225-230 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.").

### C.    Merits: Fry has demonstrated a deprivation of his constitutional right to effective assistance of counsel.

As support for this claim, Fry relies on the facts as pled in Claim for Relief 1(B), *supra*. However, a brief recitation of the key facts is also necessary here. In short, the trial court only asked counsel whether Fry wanted to testify in his case in chief; the court never asked a single question of Fry himself.

While in chambers outside the presence of Fry, the trial court specifically asked trial counsel, "If there was any vacillation, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?" (Trial Transcript, R.14-2, PageID#6324-25.) Trial counsel stated, "That's correct." (*Id*.) However, following this statement, counsel then referred to Fry's deliberative process as "playing a little game." (R.14-2, PageID#6324.) With this information in hand—particularly that Fry was "playing a little game," it was critical that the court then reaffirm on-the-record with Fry, himself, whether he

wanted to testify. Yet, instead, the trial court just took trial counsel's word at face value and never questioned Fry.

The trial court was derelict in its duty to indulge "every reasonable presumption against waiver." *Johnson*, 458 U.S. at 484. As such, the trial court violated Fry's constitutional right to testify in his own defense. This was fundamental constitutional error.

### 1.    The Ohio Court of Appeals' Decision Was Unreasonable

With the facts in the state court record, the Ohio Supreme Court made an unreasonable determination that Fry did not warrant relief. As pled in his Habeas Petition and as also explained above, the only reasonable determination of the facts and law before this Court is that the trial court had a duty to protect Fry's constitutional right to testify in his own defense. This duty would have included an obligation to verify with Fry himself whether he wanted to exercise his constitutional right to testify. Failing to make this inquiry, and, instead, merely accepting Fry's counsel's word that Fry did not want to assert this right, was a violation of Fry's constitutional rights. Thus, the Ohio Supreme Court's decision to the contrary was unreasonable.

The Ohio Supreme Court specifically found that "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Decision, R.13-1, PageID#916-17.) However, as argued above,

despite there not being an affirmative "requirement" to conduct this on-the-record inquiry, the trial court still had a duty to fervently protect Fry's constitutional rights. The trial court failed in that duty.

The state court went on, finding that "Nothing in the record suggests that Fry wished to testify but was denied the opportunity to do so." (*Id*. At PageID#917.) There may not have been much evidence in the trial record of this "fact," however that is only because trial counsel affirmatively misled the trial court when they told the court that Fry had never even vacillated in his desire to testify. *See* Claim for Relief 1(B); (*see also* Habeas Petition R.21, PageID#7539-44.) Lead counsel admitted during the post-conviction evidentiary hearing that Fry did, at the very least, vacillate. (Trial Transcript R.14-2, PageID#6811.) In addition, there was still evidence that Fry wished to testify which should have prompted further inquiry from the trial court. Trial counsel stated that Fry was "playing a little game." What was that "game?" Was the "game" that Fry continued telling counsel that he did not want to testify when he actually did? At the least, the trial court was put on notice that it needed to inquire of Fry was his actual wishes were when counsel made those statements.

It was further fundamental that Fry be allowed to testify in his defense. Fry's testimony was the only evidence trial counsel had to support their request for a voluntary manslaughter instruction. Fry asked his trial counsel to interview and

present other witnesses on his behalf. (R.14-2, PageID#6824-25, 6833-34.) But his counsel did not heed his requests. From the defense perspective, Fry was the sole witness left to explain what happened.

In addition, this was not just any case, but a death penalty case, where Fry's life was on the line. The United States Supreme Court has recognized that the fundamental right to "life" deserves the highest protection possible under the Fourteenth Amendment's protection of "life, liberty and property." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 290 (1998) (five Justices recognized distinct "life" interest protected by Due Process Clause in all stages of a capital case, above and beyond protected liberty and property interests). Death is different; and for that reason, more process is due, not less. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

At the very least, Fry put forth enough evidence that the state courts should have held an evidentiary hearing on this claim. Although the state courts held a hearing on an issue similar to this one—whether trial counsel were ineffective to Fry's prejudice when they failed to allow their client to exercise his constitutional right to testify in his own defense—the court did not grant a hearing on this claim. The state courts were unreasonable in denying this claim without an evidentiary hearing.

64

## 2.    District Court Erred in Denying Fry Habeas Relief

Here, the decision by the state appellate court to deny Fry relief was contrary to, or an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in the state court. A review of the evidence from Fry's post-conviction petition evidentiary hearing, clearly and convincingly shows that the state court erred in finding that Fry failed to show he was denied his Sixth Amendment right to testify. *See also*, Claim for Relief 1(B), *supra*.

Despite this, the District Court below denied Fry habeas relief on this claim. (Order, R.62 PageID#8355-8359.) The District Court found that the "dispositive issue for this claim is what the trial court understood regarding Fry's position on whether or not he wanted to testify." (*Id*. at PageID#8357.) According to the District Court, because "Fry's counsel were clear in representing to the court that, at that point in time, Fry 'categorically,' 'emphatically,' and 'unequivocally' did not want to testify," and because Fry did not personally notify the trial court of his desire to testify, there was no constitutional deprivation and no relief is warranted. (*Id*. at PageID#8357-8359.) Under the District Court's assessment, as long as trial counsel convincingly misleads a trial court about the wishes of their client (with regards to testimony or, seemingly, anything else that implicates a fundamental right), then no

remedy is owed for the subsequent constitutional violation. This does not comport with the guarantees of the Sixth Amendment and due process of law.

**D.    Conclusion**

The trial court was, at the least, put on notice when trial counsel referenced Fry's "little game." The record developed in post-conviction regarding Claim for Relief 1(B) establishes that Fry did in fact want to testify and that his counsel denied him that opportunity. Had the trial court adequately inquired of Fry on the record, then the constitutional deprivation could have been avoided. In a capital trial where Fry's life was on the line, the trial court chose to not make this inquiry, even once it was on notice. Fry had a constitutional right to testify in his capital trial. Fry wanted to exercise that right. His counsel knew it. The court was on notice of the possibility but failed to engage in the constitutionally required colloquy. There is no excuse for the deprivation he suffered.

Accordingly, this Court should reverse and instruct the District Court to grant Fry's habeas petition.

## CLAIM FOR RELIEF 11

**THE TRIAL COURT AND THE STATE OF OHIO VIOLATED FRY'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE COURT ERRONEOUSLY ALLOWED FRY TO WAIVE THE PRESENTATION OF MITIGATION EVIDENCE.**

The trial court violated Fry's constitutional rights when the court allowed Fry to waive the presentation of mitigation evidence in his capital trial. Fry's waiver was not made knowingly, intelligently, and voluntarily because the attorney client relationship was irreparably broken at the time of the waiver, and the waiver was born from the strain of that relationship, as well as Fry's misunderstanding about the legal consequences of the verdict, and his appellate rights. The complete breakdown in the attorney client relationship, and Fry's confusion regarding his legal rights was apparent to the trial court. By accepting the waiver, the Ohio courts violated Fry's constitutional right to have mitigation evidence heard by the sentencer. *Lockett v. Ohio*, 438 U.S. 586 (1978).

### A.    Rulings Below

The District Court determined that the state court decided this claim on the merits. (R.62, PageID#8360.) Therefore, the District Court's review was limited, pursuant to 28 U.S.C. § 2254(d), to a determination of whether the state court decision was contrary to, or an unreasonable application of federal law as determined

by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence before the court.

The District Court correctly found that due process generally requires the waiver of a constitutional right to be made knowingly, intelligently, and voluntarily, which depends, in each case, "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (R.62, PageID#8363.) (Quoting, *Johnson v. Zerbst*, 304 U.S. 458, 464). But the Court erred in determining that because the Supreme Court has not clearly established any particular procedure for a trial court to follow with regard to a waiver of mitigation evidence, that there can be no contravention or misapplication of federal law in violation of § 2254(d)(1). *Id*.

Fry raised this claim in Proposition of Law II in his direct appeal to the Ohio Supreme Court. (Merit Brief R. 13-1, PageID 583.) In denying relief, the Ohio Supreme Court relied on its prior opinion in *State v. Ashworth*, 706 N.E.2d 1231 (Ohio 1999). *State v. Fry*, 926 N.E.2d 1239, 1270 (Ohio 2010). The Ohio Supreme Court did not address the federal aspects of this claim. The Ohio Supreme Court erroneously determined that the waiver was knowing, intelligent, and voluntary. (Decision Denying Dismissal R.13-1, PageID#927.)

**B.   Clearly Established Federal Law**

It is well established that a waiver of a constitutional trial right must be knowing, intelligent, and voluntary. *Zerbst*, 304 U.S. at 464. Courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Id*. (citing *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393; *Hodges v. Easton*, 106 U.S. 408, 412) (internal quotations omitted). The Supreme Court has articulated that it has "been unyielding in [its] insistence that a defendant's waiver of his trial rights cannot be given effect unless it is 'knowing' and 'intelligent.'" *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990) (citing *Zerbst*, 304 U.S. 458).

Whether there has been a knowing, and intelligent waiver of a constitutional trial right depends "in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. 458, 464. A strict adherence to this standard for constitutional trial rights is necessary because otherwise it "leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided." *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973) (acknowledging that the standard for waivers of constitutional trial rights is much higher than for constitutional rights that are not in place to protect the accused's right to a fair trial).

In addition, the United States Supreme Court has repeatedly emphasized the requirement that a jury (or judge) consider all mitigating evidence. *Payne v. Tennessee*, 510 U.S. 808, 822 (1991) (mitigation evidence is "evidence that must be received"); *Woodson v. North Carolina*, 428 U.S. 80, 304 (1976) (finding the Constitution "require[s] consideration of the character and record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death."); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). An individualized mitigation phase is a guaranteed right under the Eighth and Fourteenth Amendments. *Lockett v. Ohio* 438 U.S. 586 (1978).

## C.    Merits

Based on United States Supreme Court precedent, this court should reject the Ohio Supreme Court's determination that the trial court did not err in accepting the mitigation waiver. The state courts should have recognized Fry could not knowingly, intelligently, and voluntarily waive his rights in a capital sentencing proceeding where the attorney-client relationship had deteriorated, and the circumstances established that Fry misunderstood the death specification and his appellate rights.

The trial court conducted a colloquy pursuant to state law based on a motion from Fry regarding waiving the presentation of mitigation evidence. (Trial Transcript R.14-2, PageID#6540.) The colloquy between the trial court included Fry's explanation to the court about his dissatisfaction with his attorneys. (*Id*.at

PageID#6544.). Fry told the trial court "*...I am not pleased with what [trial counsel] have done at all*, so there's no reason for us to parade my family up here, to do no mitigating things." (*Id.*)

The court failed to conduct an inquiry into the broken attorney client relationship, and erroneously determined Fry had knowingly and voluntarily waived his right to present mitigation. The court failed to consider that the waiver was born from the strain of the attorney client relationship, and due to a misunderstanding regarding the death specification and his appellate rights. The Ohio Supreme Court misapplied established federal law by finding the waiver to be knowing and intelligent. (Decision Denying Dismissal R.13-1, PageID#924-931) And the Ohio Supreme Court made an unreasonable determination of fact, and misapplied established federal law in finding that the evidence of Fry's broken relationship with counsel did not necessitate further inquiry into its' effect on Fry waiving mitigation. (*Id.* at PageID#927.)

The District Court's analysis was flawed because it failed to acknowledge that the Supreme Court articulated in *Johnson v. Zerbst* the standard to evaluate whether a waiver is knowing and intelligent, i.e., the court must consider "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 304 U.S. 458, 464.

The court below side stepped application of the standard in *Johnson v. Zerbst*, without considering that the facts and circumstances of Fry's case, taken as a whole, establish that Fry's waiver was not made knowingly and intelligently, or at the very least did necessitate further inquiry into whether Fry's mitigation waiver was born from the broken attorney client relationship.

The United States Supreme Court has observed that capital cases should be subject to heightened scrutiny because death "is different in both its severity and its finality." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). Certainly this "heightened scrutiny" is required when the consequences of a criminal defendant's choices could lead to his own undoing.

### E.    Conclusion

Fry's waiver was not made knowingly and intelligently based on all of the circumstances that existed at the time of the waiver. The Ohio court's determination to that it was made knowingly and intelligently contravened the governing law, and relied on an unreasonable determination of fact. The District Court failed to apply *Johnson v. Zerbst* in analyzing this claim. This Court should either grant him relief, ordering a new trial, or remand to the District Court with instructions to grant discovery and a hearing to prove that Fry's waiver was not made knowingly, intelligently, and voluntarily.

## CLAIM FOR RELIEF 19

**FRY'S APPELLATE COUNSEL WERE INEFFECTIVE BY FAILING TO RAISE ON DIRECT APPEAL TO THE OHIO SUPREME COURT THAT FRY'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PLEA BARGAINING PROCESS, DEPRIVING FRY OF HIS DUE PROCESS RIGHTS UNDER U. S. CONST. AMENDS. 6 & 14.**

Appellate counsel violated Fry's right to effective assistance of counsel on appeal when counsel failed to include in Fry's merit brief to the Supreme Court of Ohio a claim that trial counsel was ineffective in relaying the state's offered plea deal. The Ohio Supreme Court denied Fry his constitutional right to Due Process when it denied him an opportunity to be heard on his application to reopen his direct appeal pursuant to Ohio Supreme Court Practice Rule 11.06. (R.13-1, PageID#1430.)

### A.    Rulings Below

The District Court determined this claim to be procedurally defaulted, finding the presumption of a merits ruling set forth in *Harrington v. Richter*, 562 U.S. 86, 99 (2011) was overcome by Fry's untimely filing of his Application to Re-Open his direct appeal. (Order, R.62, PageID#8386.) The Court alternatively found that because it denied the underlying ineffective assistance of counsel claim that there was no prejudice resulting from appellate counsel's failure to raise this claim in the direct appeal to the Supreme Court of Ohio. (*Id.*, at PageID#8387.)

Fry filed a direct appeal challenging, among other things, the constitutionality of his conviction. (Merit Brief R.13-1, PageID#538.) On May 22, 2009, the Ohio Supreme Court denied Fry's appeal. (*Id*. at PageID#538-705.) On September 7, 2012, appointed counsel filed an application to reopen the direct appeal pursuant to Ohio Supreme Court Practice Rule 11.06, raising in one claim the ineffective assistance of appellate counsel for failing to raise a claim related to trial counsel's deficiency in failing to convey the State's plea offer to Fry. (Application for Reopening R.13-1, PageID#976-1424.) The Ohio Supreme Court issued a two-sentence order denying the application. (Decision Denying Reopening R.13-1, PageID#1430.) All state remedies for these claims have been exhausted, yet no state court has issued a reasoned decision on the claims of ineffective assistance of appellate counsel.

### B.    Procedural Default

The District Court's determination that this claim was procedurally defaulted is erroneous. First, procedural default is an affirmative defense and must be raised, or it is waived. Fed. R. Civ. P. 8(b)(1)(A); *see, e.g.*, *Jamison v. Collins*, 100 F.Supp.2d 521, 597 (S.D. Ohio 1998). The Warden did not raise procedural default as an affirmative defense in his first responsive pleading, the Return of Writ. This failure constitutes a waiver. *Id*. In addressing this failure in the Sur-Reply, the Warden claimed that he properly raised procedural default as to Fry's Nineteenth

Claim for Relief in the Return of Writ by stating, "Under these circumstances, relief on claim 14 is precluded for failure of fair presentation. Fry fares no better with claim 19 that asserts ineffective assistance of appellate counsel." (Warden's Return of Writ, R.24, PageID#7797.) The Warden argued that Fry's Fourteenth Claim for Relief had not been fairly presented to the Ohio Supreme Court merely because it was part of the ineffective assistance of appellate counsel claims brought in Fry's Application to Re-open his direct appeal with Supreme Court of Ohio. (*Id*.)

However, in context, the Warden proceeded to argue that Fry's Nineteenth Claim for Relief "fares no better" than Fry's Fourteenth Claim for Relief because it "failed to show entitlement to habeas relief due to deficient pleading and the consequential failure to overcome the double deference afforded to the denial of his application to reopen the direct appeal." (*Id*. at PageID#7798.) At no point did the Warden assert, mention, refer, or otherwise allude to procedural default as a defense to Claim Nineteen or any of its sub-claims in its Return of Writ. (*Id*. at PageID#7797). Although the Warden properly raised procedural default to Fry's Fourteenth Claim for Relief, he did not do the same for Claim Nineteen.

Because the Warden did not raise the affirmative defense in his Return of Writ[2], Fry was never afforded the opportunity to address and brief the issue of

---

[2] The District Court acknowledged that "Respondent, in his return of writ, asserted the defense **ambiguously at best.**" Memorandum Opinion and Order Denying Writ of Habeas Corpus, R.62 PageID#8386 n 25 (emphasis added). Since Respondent did

procedural default as to his Nineteenth Claim for Relief in his Traverse. Since the District Court declared the claim to be procedurally defaulted without the Warden clearly raising the defense, the court's action was akin to raising procedural default *sua sponte*.

The District Court further erred in failing to provide Fry with an opportunity to submit additional briefing so as not to be disadvantaged. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002)) ("The main concern with raising procedural default *sua sponte* is that a petitioner not be disadvantaged without having had an opportunity to respond."). Some Circuits even require federal courts to provide an opportunity for the petitioner to respond when a court, *sua sponte,* interposes a default, lest the habeas proceeding be rendered fundamentally unfair. *See, e.g.*, *Esslinger v. Davis*, 44 F.3d 1515, 1528 (5th Cir. 1998); *Washington v. James*, 996 F.2d 1442, 1444 (2d. Cir. 1993); *Hardiman v. Reynolds*, 871 F.2d 500, 505 (10th Cir. 1992). This Court has declined to rule on the issue of procedural default, even when the petitioner had an opportunity to respond, but the Warden had raised the affirmative defense of procedural default in a "somewhat oblique manner." *See, e.g.*, *Lorraine*, 391 F.3d at 426-427.

---

not clearly assert procedural default as an affirmative defense, Fry should have been given a fair opportunity to respond. He was not.

Although the Warden waived the defense, Fry was aware that there was a chance that the District Court could raise the issue *sua sponte*, or even, as the district court did, find that the Warden had not waived the defense. (Traverse to Return of Writ, R.32, PageID#7975 n.4.) ("Fry is unsure if this Court would hold that Fry must still overcome procedural default as to this claim."). As a result, Fry requested that if the District Court ruled that Fry must overcome procedural default with regard to Fry's Nineteenth Claim for Relief that "the [District] Court grant additional briefing where any alleged default… may be presented and thoroughly argued." *Id*. The District Court never granted this request before it issued its Memorandum of Opinion and Order, in which it found that the Warden had asserted a procedural default defense, (Order R.62, PageID#8385-86 n.25.), and that the "claim is procedurally defaulted." (*Id.* at PageID#8386.)

Finally, although a state procedural rule can be used to establish procedural default of a federal habeas claim, that state procedural rule needs to actually be enforced and be an adequate and independent state ground on which the Warden can rely. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). To be adequate, a procedural rule must be a "firmly established and regularly followed state practice." *Ford v. Georgia,* 498 U.S. 411, 413 (1991)*.* States must consistently apply and evenhandedly enforce the rule. A state rule is not adequate when the rule was not regularly enforced at the time of conviction. *See Rogers v. Howes*, 144 F.3d 990,

994-95 (6th Cir. 1998); *see also Mapes v. Coyle*, 171 F.3d 408, 429 (6th Cir. 1999) (holding that a state procedural ground for failing to review claim was based upon "erroneous circular reasoning" and was therefore inadequate).

Under Ohio law, ineffective-assistance-of-appellate-counsel claims must be raised under Ohio R. App. R. 26(B) or Ohio S. Ct. Prac. R. 11(6). *See State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). A "*Murnahan* application" seeks delayed reconsideration in the appellate court in which the alleged error took place. *Id.* The rule requires these applications to be filed within ninety days of the journalized entry of the court's opinion. *Franklin v. Anderson*, 434 F.3d 412, 419 (6th Cir. 2006).

The Supreme Court of Ohio's treatment of the timeliness of Applications to Reopen in capital cases has been "erratic" and has "fluctuated" noticeably since 2000. *Id.* at 420-21 (listing cases and inconsistent dispositions). This Court has concluded that the ninety-day time limit is not an "actually enforced" "state procedural sanction." *Id.* at 420 (citing *Maupin*, 785 F.2d at 138). Therefore, the Ohio rule was found "not [to be] an adequate and independent state rule" that is regularly established and followed so it would preclude consideration of an IAAC claim on habeas review. *Franklin*, 434 F.3d at 421.

However, one aspect of the Ohio Supreme Court's treatment of timely and untimely Applications to Re-open is consistent – they are routinely and cursorily denied without any merits review. Fry's Application to Re-open was denied like any

other. If this Court was to compare timely-filed Applications to Re-Open, which were similarly denied, these rulings would look identical, lending to the presumption that Fry's was denied in the same way—with a merits ruling. *See State v. Short,* 2006-Ohio-1366*; State v. Hunter,* 2007-Ohio-2021*; State v. Jones,* 2008-Ohio-0525; *State v. Osie*, 2010-Ohio-1105 (all filed close in time to Fry's Application to Re-Open; *see also State v. Drain,* 2020-Ohio-0652*; State v. Madison,* 2016-Ohio-1006*; State v. Garrett,* 2019-Ohio-1381*; State v. Whitaker,* 2019-Ohio-1482 (establishing that the Supreme Court of Ohio's treatment of Applications to Re-Open has continued to result in summary denials). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Because the Supreme Court of Ohio has treated timely and untimely applications to re-open in a similar rote manner, the presumption in *Richter* applies to defeat any procedural default.

Additionally, "[a] habeas petitioner can obtain review of a procedurally defaulted claim by establishing ineffective assistance of counsel." *Kares v. Morrison*, 77 F.4th 411, 424 (6th Cir. 2023). "To establish ineffective assistance of counsel, a habeas petitioner must demonstrate both deficient performance by his

attorney and a reasonable probability of a different outcome in the proceedings absent counsel's error." *See Strickland*, 466 U.S. at 688, 694.

Here, Fry received repetitious ineffective assistance of counsel. Because Fry's underlying ineffective assistance of trial counsel claim is meritorious (see Claim for Relief 1(A)), appellate counsel was ineffective for failing to raise it on direct appeal, as argued herein. Because appellate counsel was ineffective for raising it on direct appeal, his then appellate counsel should have filed it in a timely application to re-open his direct appeal. His counsel's failure to timely file this claim prejudiced Fry in that the District Court determined that it was procedurally defaulted, even though that decision was incorrect for the myriad ways detailed above.

While Fry argues that the Ohio Supreme Court's treatment of applications to re-open is erratic and does not operate as an independent and adequate state procedural rule, Fry's counsel was also ineffective for failing to abide by the time requirements for filing the application re-open.

Therefore, the District Court erred in determining that this claim was procedurally defaulted. At the very least, Fry should have been granted an opportunity to present cause and prejudice to overcome any alleged default, which he can establish through counsel's ineffective assistance in timely filing the application re-open his direct appeal.

### C.    Clearly Established Federal Law

A criminal defendant enjoys the right to effective assistance of appellate counsel under the Constitution. *See Evitts v. Lucey*, 469 U.S. 387 (1985). The Sixth Circuit has interpreted the decision in *Evitts* by extending the standard for ineffective assistance of counsel codified in *Strickland v. Washington* to appellate claims. *See Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). When considering ineffective assistance of appellate counsel claims, the reviewing court must look to the reasonableness of counsel's actions, and whether counsel's actions prejudiced petitioner. *See Strickland v. Washington*, 466 U.S. 668 (1984). There was at least a reasonable probability of success on the claims contained in the application to re-open, and by failing to include the claims in the initial appeal, appellate counsel's performance prejudiced Fry.

### D.    Merits

Appellate counsel rendered ineffective assistance when they failed to raise on direct appeal that Fry's trial counsel provided ineffective assistance to Fry during the plea-bargaining process. Plea bargaining is a critical stage. Trial counsel has a duty to provide effective representation to the client during that critical stage. *See, e.g.*, *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012); *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). The lawyer's duties in this respect certainly include, at a minimum, the duty to communicate and explain to the client any plea offers made by the State, in

a timely manner, so that the client will be able to make an informed decision about whether to accept or reject the State's proposed plea bargain. *Frye*, 132 S. Ct. at 1408. *See* discussion Claim for Relief 1(A), *supra*. Because the underlying claim is meritorious, appellate counsel's failure to raise this claim was ineffective and prejudicial to Fry.

Just as trial counsel held Fry's life in their hands and squandered it by failing to provide competent assistance of counsel during plea negotiations, appellate counsel did the same by failing to identify and raise trial counsel's deficient performance. The result is that the underlying claim has never received the judicial scrutiny it deserves, and the prejudice to Fry is his sentence of death borne from the defective assistance of counsel at both levels.

## E.    Conclusion

Fry's appellate counsel failed to raise ineffective assistance of trial counsel at the critical plea-bargaining stage. There is no reasonable explanation for appellate counsel's failure to raise this claim, and Fry was prejudiced by that failure. Appellate counsel rendered ineffective assistance and deprived Fry of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. This Court should grant Fry relief by reversing and instructing the District Court to grant Fry's habeas petition.

## II.    CONCLUSION

For the foregoing reasons, this Court should grant Fry relief by ordering a new trial or remanding to the District Court with instructions to grant Fry's habeas petition.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)         */s/ Kimberly S. Rigby*
FEDERAL PUBLIC DEFENDER             KIMBERLY S. RIGBY (0078245)
                                    Managing Counsel, Death Penalty Dept.
*/s/ Sharon A. Hicks*
SHARON A. HICKS (0076178)           */s/ Adam D. Vincent*
Assistant Federal Public Defender   ADAM D. VINCENT (0098778)
Lead Counsel                        Office of the Ohio Public Defender
Office of the Federal Public Defender 250 E. Broad Street, Suite 1400
Capital Habeas Unit, ND Ohio        Columbus, OH 43215
1660 West Second Street, Suite 750  (614) 466-5394; (614) 644-0708 (f)
Cleveland, Ohio 44113               Kimberly.Rigby@opd.ohio.gov
(216) 522-4856; (216) 522-1951(f)   Adam.Vincent@opd.ohio.gov
Sharon_Hicks@fd.org

## CERTIFICATE OF COMPLIANCE

I hereby certify the above brief is comprised of 19,054 words, in 14-point Times New Roman font, as indicated by MS Word's computer-generated word count program, and, therefore, complies with Fed. R. App. P. 32(a)(7)(B).

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2024, a true copy of the foregoing **Appellant's Merit Brief** was re-filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

*/s/ Sharon A. Hicks*
SHARON A. HICKS

## PETITIONER-APPELLANT'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to 6 Cir. R. 28(b)(1)(A)(i), Petitioner-Appellant Clarence Fry hereby designates the following relevant district court documents:

| | *Clarence Fry v. Tim Shoop, Warden*<br>**U.S. District Court Case No. 1:19-cv-023017, ND Ohio** | |
|---|---|---|
| **Record Entry No.** | **Description** | **PageID#** |
| 13-1 | Appendix Trial Court, Direct Appeal | 75-81, 97, 102, 538-705, 924-931, 976-1424, 1430 |
| 13-2 | Appendix Post-Conviction- Trial Court | 1469, 1511-12, 1519-22, 1524, 1531-92, 1638, 2635, 2642-2643, 2704, 2710-19, 2755, 2882-2906 |
| 13-3 | Appendix Post-Conviction- All Appeals | 3074-87, 3245-67, 3249-51, 3756-73, 3283, 3871 |
| 13-5 | Appendix Case Exhibits- Part 2 | 4110-11, 4237-39, 4259-60 |
| 14-1 | State Court Transcripts- Part 1 | 4280, 4372, 4494, 5068, 5059-60, 5231, 5240, 5383, 5439-40, 5441, |

| Record Entry No. | Description | PageID# |
|---|---|---|
| | ***Clarence Fry v. Tim Shoop, Warden***<br>**U.S. District Court Case No. 1:19-cv-023017, ND Ohio** | |
| | | |
| | | 5585, 5724-25, 5901, 6048, 6054, 6070, 6077, 6227, 6280-92, 6513-14 |
| 14-2 | State Court Transcripts- Part 2 | 6224, 6230-66, 6277-91, 6312-25, 6354, 6540-71, 6727, 6744-47, 6776-79, 6780, 6782-86, 6788-89, 6810-11, 6815-56, 6877-6972 |
| 21 | Petition under 28 USC 2254 for Writ of Habeas Corpus | 7475-7636 |
| 24 | Warden's Return of Writ Answer to Habeas Petition | 7797-98 |
| 32 | Traverse to Return of Writ | 7975 |
| 62 | Memorandum Opinion and Order | 8260-8398 |